RICHARD L. SIMON AND FIONA SIMON, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 4817–92.        Filed August 22, 1994.

*Arthur Pelikow, Norman Gold,* and *Milton Sherman,* for petitioners.

*Pamela L. Cohen, Paulette Segal,* and *Kevin Kilduff* (specially recognized), for respondent.

LARO, *Judge:* Richard Simon and Fiona Simon petitioned the Court for a redetermination of respondent's determinations in a notice of deficiency issued to them on December 11, 1991. In the notice respondent determined a $21,198 deficiency in petitioners' 1989 Federal income tax and a $4,240 addition thereto under section 6662(a) of the Internal Revenue Code in effect for 1989. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for 1985. See *infra* note 3. Rule references are to the Tax Court Rules of Practice and Procedure.

Due to concessions by the parties, the sole issue for decision is whether petitioners are entitled to deduct depreciation claimed under the accelerated cost recovery system (ACRS) for the year in issue.[1] Petitioners claimed depreciation on two 19th-century violin bows that they used in their trade or business as full-time professional violinists. As discussed below, we hold that petitioners may depreciate their violin bows during the year in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. For the taxable year in issue, petitioners were husband and wife and filed a 1989 Form 1040, U.S.

---

[1] On Sept. 16, 1993, the parties filed a stipulation of settled issues that resolved all issues in the case except the depreciation issue mentioned above.

Individual Income Tax Return, using the status of "Married filing joint return". When they filed their petition in this case, petitioners resided in New York, New York.

*Petitioners' Backgrounds*

Richard Simon started playing and studying the violin in 1943, at the age of 7. In 1945, he was awarded a full scholarship to the Manhattan School of Music. He studied the violin there through college and received a bachelor of music degree in 1956. Following his graduation, Richard Simon pursued a master's degree in music by taking additional courses at the Manhattan School of Music and Columbia University. Throughout his education, Richard Simon studied the violin under many renowned musicians.

In 1965, Richard Simon joined the New York Philharmonic Orchestra (orchestra) and began playing in its first violin section. In 1981, he joined and began playing with the New York Philharmonic Ensembles (ensembles) (hereinafter, the orchestra and the ensembles are collectively referred to as the Philharmonic). Since 1965, Richard Simon has maintained two careers, one as a player with the orchestra (and later with the Philharmonic) and the second as a soloist, chamber music player, and teacher.

Fiona Simon began playing and studying the violin at the age of 4. Her musical studies included courses at Purcell School in London from 1963–71 and at the Guildhall School of Music from 1971–73. Throughout her career, Fiona Simon studied the violin with renowned musicians.

In 1985, Fiona Simon joined the Philharmonic and began playing in its first violin section. Since 1985, Fiona Simon has maintained two careers, one as a full-time player with the Philharmonic and a second as a soloist, chamber music player, teacher, and free-lance performer.

During the year in issue, petitioners were both full-time performers with the Philharmonic, playing locally, nationally, and internationally in the finest concert halls in the world. In 1989, petitioners performed four concerts per week with the Philharmonic, playing over 200 different works, and attended many rehearsals with the Philharmonic that were more demanding and more time-consuming than the con-

certs. Petitioners also carried out the busy schedules connected with their second careers.

*Construction of a Violin Bow*

A violin bow consists of a flexible wooden stick, horsehair, a frog, and a ferrule (screw). The stick, which varies in thickness, weight, and balance, is the working part of the bow and is an integral part in the production of sound through vibration. It is designed so that horsehair can be stretched between its ends.

The horsehair is a group of single strands of hair that come from the tails of Siberian horses. A hatchet-shaped head holds one end of the horsehair, and the other end is attached to a frog. The frog, which is inserted into the stick, is a movable hollow piece by which the bow is held. The frog has an eyepiece on the end that catches the screw. The screw is the small knob at the end of the bow that is adjusted to tighten or loosen the horsehair in order to change the tension on the horsehair. The horsehair is the part of the bow that touches the violin strings. Rosin is applied to the horsehair to supply the frictional element that is necessary to make the violin strings vibrate.

Old violins played with old bows produce exceptional sounds that are superior to sounds produced by newer violins played with newer bows. The two violin bows in issue were made in the 19th century by François Xavier Tourte (1747–1835). François Tourte is considered the premier violin bow maker. In particular, he is renowned for improving the bow's design. (Hereinafter, the two bows in issue are separately referred to as bow 1 and bow 2, and are collectively referred to as the Tourte bows.)

*Purchase of the Tourte Bows*

On November 13, 1985, petitioners purchased bow 1 for $30,000; the bow was purchased from Moes & Moes, Ltd., a dealer and restorer of violins and violin bows. On December 3, 1985, petitioners purchased bow 2 from this dealer for $21,500. The sticks, frogs, and screws were originals of François Tourte at the time of each purchase. No cracks or other defects were apparent in the sticks at t' e time of each

purchase. The frogs and screws, however, were not in playable condition. Therefore, petitioners replaced them.

Petitioners acquired the Tourte bows for regular use in their full-time professional employment as violinists. Petitioners purchased the Tourte bows for their tonal quality, not for their monetary value.[2] In the year of acquisition, petitioners began using the Tourte bows with the original sticks in their trade or business as full-time professional violinists. Petitioners continued to use the Tourte bows with the original sticks during the year in issue.

## Depreciation Deductions Claimed for the Tourte Bows

On their 1989 Form 1040, petitioners claimed a depreciation deduction of $6,300 with respect to bow 1 and $4,515 with respect to bow 2; these amounts were in accordance with the appropriate ACRS provisions that applied to 5-year property. See sec. 168(b)(1).[3] Respondent disallowed petitioners' depreciation deduction in full and reflected her disallowance in the notice of deficiency at issue here.

## Conditions Affecting the Wear and Tear of Violin Bows

Playing with a bow adversely affects the bow's condition; when a musician plays with a bow, the bow vibrates up, down, sideways, and at different angles. In addition, perspiration from a player's hands enters the wood of a bow and ultimately destroys the bow's utility for playing. Cracks and heavy-handed bearing down while playing certain pieces of music also create wear and tear to a bow. A player who has a heavy hand may cause the stick to press against the horsehair; in turn, this may cause the bow to curve and warp. The appendix illustrates the wear and tear that was suffered by a violin bow that was used for 20 to 25 years.[4]

---

[2] Richard Simon plays a violin made by Nicolò Amati in 1660. Fiona Simon plays a violin made circa 1750. The combination of these old violins and the Tourte bows results in a magnificent sound that is superior to the sounds produced by newer instruments.

[3] Because the Tourte bows were placed in service in 1985, the Internal Revenue Code applicable to that year governs the computation of depreciation for the taxable year in issue. Sec. 168(b)(1); see also Tax Reform Act of 1986 (TRA), Pub. L. 99–514, secs. 201(a), 203(a)(1), 100 Stat. 2085, 2121, 2143 (in general, TRA amended sec. 168 effective for property placed in service after Dec. 31, 1986, in taxable years ending after that date).

[4] The appendix (petitioners' Exhibit 15) is not one of the Tourte bows. The appendix is provided to show the nature of the types of wear and tear that a bow can suffer. The large indentation at the bottom of the stick immediately before the frog was caused by perspiration and pressure from the player's thumb. See 1 infra the appendix. Further down the stick towards the

Petitioners' use of the Tourte bows during the year in issue subjected the bows to substantial wear and tear.

Frequent use of a violin bow will cause it to be "played out", meaning that the wood loses it ability to vibrate and produce quality sound from the instrument. From the point of view of a professional musician, a "played out" bow is inferior and of limited use. The Tourte bows were purchased by petitioners, and were playable by them during the year in issue, only because the Tourte bows were relatively unused prior to petitioners' purchase of them; the Tourte bows had been preserved in pristine condition in collections.[5] At the time of trial, the condition of the Tourte bows had deteriorated since the dates of their purchase. Among other things, the sticks on the Tourte bows were worn down.

*Value of the Tourte Bows*

On November 21, 1985, bow 1 was appraised for insurance purposes as having a fair market value of $35,000. On December 3, 1985, bow 2 was appraised for insurance purposes as having a fair market value of $25,000. Petitioners obtained both appraisals from Moes & Moes, Ltd.

In 1994, at the time of trial, the Tourte bows were insured with the Philharmonic for $45,000 and $35,000, respectively. These amounts are based on an appraisal dated May 14, 1990, from Yung Chin Bowmaker, a restorer and dealer of fine bows. The record does not indicate whether these appraised amounts were the fair market values of the Tourte bows or were their replacement values.

An independent market exists for the Tourte bows and other antique bows. Numerous antique bows (including bows made by François Tourte) are regularly bought and sold in this market. The Tourte bows are unadorned; they are not as lavish or decorative as some other bows (including other bows made by François Tourte) that are sold in the independent market. Adornments on other bows include engravings, gold, silver, ivory, and mother-of-pearl.

---

right is a second indentation that was caused by perspiration and pressure from the player's hand. See 2 *infra* the appendix.

[5] Indeed, bow 1 had never been used prior to petitioners' purchase of it. According to its certificate of authenticity, bow 1 was made by François Tourte about 1810 to 1820. Thus, it was approximately 175 years old when petitioners purchased it.

One factor that adds value to the Tourte bows is the fact that Pernambuco wood, the wood that was used to make the sticks, is now very scarce. The wood that is currently used to make the sticks of violin bows is inferior to Pernambuco wood.

OPINION

The burden of proof is on petitioners to show that respondent's determinations set forth in her notice of deficiency are incorrect. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933). The issue that we must decide is whether petitioners are entitled to deduct depreciation under ACRS with respect to the Tourte bows.

Taxpayers have long been allowed asset depreciation deductions in order to allow them to allocate their expense of using an income-producing asset to the periods that are benefited by that asset. The primary purpose of allocating depreciation to more than 1 year is to provide a more meaningful matching of the cost of an income-producing asset with the income resulting therefrom; this meaningful match, in turn, bolsters the accounting integrity for tax purposes of the taxpayer's periodic income statements. *Hertz Corp. v. United States,* 364 U.S. 122, 126 (1960); *Massey Motors, Inc. v. United States,* 364 U.S. 92, 104 (1960). Such a system of accounting for depreciation for Federal income tax purposes has been recognized with the approval of the Supreme Court for over 65 years; as the Court observed in 1927: "The theory underlying this allowance for depreciation is that by using up the plant, a gradual sale is made of it." *United States v. Ludey,* 274 U.S. 295, 301 (1927); see also *Massey Motors, Inc. v. United States, supra* at 104. In this sense, an allocation of depreciation to a given year represents that year's reduction of the underlying asset through wear and tear. *United States v. Ludey, supra* at 300–301. Depreciation allocations also represent a return to the taxpayer of his or her investment in the income-producing property over the years in which depreciation is allowed. *Virginian Hotel Corp. v. Helvering,* 319 U.S. 523, 528 (1943); *Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 101 (1943).

Prior to the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97–34, 95 Stat. 172, personal property was depre-

ciated pursuant to section 167 of the Internal Revenue Code of 1954 (1954 Code). Section 167(a) provided:

SEC. 167(a). GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
　　(1) of property used in the trade or business, or
　　(2) of property held for the production of income.

The regulations under this section expanded on the text of section 167 by providing that personal property was only depreciable before ERTA if the taxpayer established the useful life of the property. See sec. 1.167(a)–1(a) and (b), Income Tax Regs.

The "useful life" of property under pre-ERTA law was the period over which the asset could reasonably be expected to be useful to the taxpayer in his or her trade or business, or in the production of his or her income. *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272, 277 (1966); *Massey Motors, Inc. v. United States, supra;* sec. 1.167(a)–1(b), Income Tax Regs. This useful life period was not always the physical life or maximum useful life inherent in the asset. *Massey Motors, Inc. v. United States, supra;* sec. 1.167(a)–1(b), Income Tax Regs. A primary factor to consider in determining an asset's useful life was any "wear and tear and decay or decline from natural causes" that was inflicted upon the asset. Sec. 1.167(a)–1(b), Income Tax Regs.

Before ERTA, the primary method that was utilized to ascertain the useful life for personal property was the asset depreciation range (ADR) system. Under the ADR system, which was generally effective for assets placed in service after 1970 and before 1981, property was grouped into broad classes of industry assets, and each class was assigned a guideline life. See, e.g., sec. 1.167(a)–11, Income Tax Regs.; Rev. Proc. 83–35, 1983–1 C.B. 745, superseded by Rev. Proc. 87–56, 1987–2 C.B. 674; see also ERTA sec. 209(a), 95 Stat. 226. A range of years, i.e., the ADR, was then provided for each class of personal property; the ADR extended from 20 percent below to 20 percent above the guideline class life. For each asset account in the class, the taxpayer selected either a class life or an ADR that was utilized as the useful life for computing depreciation. See, e.g., sec. 1.167(a)–11(a), Income Tax Regs.; Rev. Proc. 83–35, *supra.* If an asset was not

eligible for ADR treatment, or if the taxpayer did not elect to use the ADR system, the useful life of that asset was generally determined based on either the particular facts and circumstances that applied thereto, or by agreement between the taxpayer and the Commissioner. *Massey Motors, Inc. v. United States, supra;* sec. 1.167(a)–1(b), Income Tax Regs. See generally Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 67 (J. Comm. Print 1981) (hereinafter referred to as the 1981 Bluebook).

In enacting ERTA, the Congress found that the pre-ERTA rules for determining depreciation allowances were unnecessarily complicated and did not generate the investment incentive that was critical for economic expansion. The Congress believed that the high inflation rates prevailing at that time undervalued the true worth of depreciation deductions and, hence, discouraged investment and economic competition. The Congress also believed that the determination of useful lives was "complex" and "inherently uncertain", and "frequently [resulted] in unproductive disagreements between taxpayers and the Internal Revenue Service." S. Rept. 97–144, at 47 (1981), 1981–2 C.B. 412, 425. See generally 1981 Bluebook, at 75. Accordingly, the Congress decided that a new capital cost recovery system would have to be structured which, among other things, lessened the importance of the concept of useful life for depreciation purposes. S. Rept. 97–144, *supra* at 47, 1981–2 C.B. at 425. See generally 1981 Bluebook, at 75. This new system is ACRS. ACRS is mandatory and applies to most tangible depreciable assets placed in service after 1980 and before 1987. ERTA sec. 209(a), 95 Stat. 172; see also Tax Reform Act of 1986, Pub. L. 99–514, secs. 201(a), 203(a)(1), 100 Stat. 2085, 2121, 2143.

The rules implementing ACRS were prescribed in section 168. According to the relevant parts of this section, as added to the 1954 Code by ERTA:

SEC. 168(a). ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property.[6]

---

[6] Sec. 167(a) of the 1954 Code as amended by ERTA, which contains the general rule for depreciation, cross-references sec. 168 of the 1954 Code as amended by ERTA as follows: "In the case of recovery property (within the meaning of section 168), the deduction allowable under

(b) Amount of Deduction.—

(1) In general.—Except as otherwise provided in this section, the amount of the deduction allowable by subsection (a) for any taxable year shall be the aggregate amount determined by applying to the unadjusted basis of recovery property the applicable percentage determined in accordance with the following tables:

\* \* \* \* \* \* \*

(B) For property placed in service in 1985.[7]—

*The applicable percentage for the class of property is:*

| If the recovery year is: | 3-year | 5-year | 10-year | 15-year public utility |
|---|---|---|---|---|
| 1 | 29 | 18 | 9 | 6 |
| 2 | 47 | 33 | 19 | 12 |
| 3 | 24 | 25 | 16 | 12 |
| 4 | | 16 | 14 | 11 |
| 5 | | 8 | 12 | 10 |
| 6 | | | 10 | 9 |
| 7 | | | 8 | 8 |
| 8 | | | 6 | 7 |
| 9 | | | 4 | 6 |
| 10 | | | 2 | 5 |
| 11 | | | | 4 |
| 12 | | | | 4 |
| 13 | | | | 3 |
| 14 | | | | 2 |
| 15 | | | | 1 |

\* \* \* \* \* \* \*

(c) Recovery Property.—For purposes of this title—

(1) Recovery property defined.—\* \* \* the term "recovery property" means tangible property of a character subject to the allowance for depreciation—

(A) used in a trade or business, or

(B) held for the production of income.

(2) Classes of recovery property.—Each item of recovery property shall be assigned to one of the following classes of property:

---

section 168 shall be deemed to constitute the reasonable allowance provided by this section".

[7] In addition to the four classes mentioned below, sec. 168 of the 1954 Code as amended by ERTA provided a fifth class of recovery property known as "15-year real property". Sec. 168(c)(2)(D) as added to the 1954 Code by ERTA. Sec. 168(c)(2)(D) as added to the 1954 Code by ERTA was subsequently amended by sec. 206(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 431. This subsequent amendment, in relevant part, changed the applicable percentages for 5-year class property placed in service in 1985, to 15, 22, 21, 21, and 21.

(A) 3-YEAR PROPERTY.—The term "3-year property" means section 1245 class property[8]—

(i) with a present class life of 4 years or less * * *

* * * * * * *

(B) 5-YEAR PROPERTY.—The term "5-year property" means recovery property which is section 1245 class property and which is not 3-year property, 10-year property, or 15-year public utility property.

(C) 10-YEAR PROPERTY.—The term "10-year property" means—

(i) [certain] public utility property * * *; and

(ii) [certain] section 1250 class property * * *.

Thus, through ERTA, the Congress minimized the importance of useful life by: (1) Reducing the number of periods of years over which a taxpayer could depreciate his or her property from the multitudinous far-reaching periods of time listed for the ADR system to the four short periods of time listed in ERTA (i.e., the 3-year, 5-year, 10-year, and 15-year ACRS periods), and (2) basing depreciation on an arbitrary statutory period of years that was unrelated to, and shorter than, an asset's estimated useful life. This minimization of the useful life concept through a deemed useful life was in spirit with the two main issues that ERTA was designed to address, namely: (1) Alleviating the income tax problems that resulted mainly from complex depreciation computations and useful life litigation, and (2) responding to economic policy concerns that the pre-ERTA depreciation systems spread the depreciation deductions over such a long period of time that investment in income-producing assets was discouraged through the income tax system. S. Rept. 97–144, *supra* at 47, 1981–2 C.B. at 425. See generally 1981 Bluebook, at 75.

With respect to the pre-ERTA requirement of useful life, the Commissioner had initially taken the position that a taxpayer generally could not deduct depreciation on expensive works of art and curios that he purchased as office furniture. See A.R.R. 4530, II–2 C.B. 145 (1923). This position was superseded by a similar position that was reflected in Rev. Rul. 68–232, 1968–1 C.B. 79. That ruling states:

A valuable and treasured art piece does not have a determinable useful life. While the actual physical condition of the property may influence the value placed on the object, it will not ordinarily limit or determine the use-

---

[8] The term "section 1245 class property" generally means personal property that "is or has been property of a character subject to the allowance for depreciation provided in section 167". Secs. 168(g)(3), 1245(a)(3) of the 1954 Code as amended by ERTA.

ful life. Accordingly, depreciation of works of art *generally* is not allowable. [Emphasis added.]

In the instant case, respondent determined that petitioners were not entitled to deduct depreciation for the Tourte bows. On brief, respondent supports her disallowance with two primary arguments. First, respondent argues that the useful lives of the Tourte bows are indeterminable because the bows are treasured works of art for which it is impossible to determine useful lives. According to respondent, the Tourte bows are works of art because the Tourte bows have existed for more than 100 years and have increased in value over that time; the presence of an independent market for the Tourte bows also gives them a value independent of their capacity to be used to play music, and serves to extend their useful lives indefinitely.

As an alternative to this first argument, respondent argues that the Tourte bows are depreciable under section 168 only if petitioners first prove that each bow has a determinable useful life within the meaning of section 167. In this regard, respondent contends that petitioners must prove a specific or reasonable estimate of the number of years that the Tourte bows will be useful in order to depreciate them under ACRS. Given that the Tourte bows have existed for more than 100 years, respondent concludes, petitioners may not depreciate the Tourte bows because petitioners cannot determine the number of remaining years during which the Tourte bows will continue to be useful.

Petitioners' argument is more straightforward. According to petitioners, they may claim depreciation on the Tourte bows because the Tourte bows: (1) Were necessary to their profession as full-time professional violinists, and (2) suffered wear and tear attributable to their use in that profession. In this regard, petitioners contend, the Tourte bows can be used to produce beautiful sounds superior to those produced by any newer bow, and the Tourte bows harmonize this beautiful music with the reputation of the Philharmonic as one of the most prestigious orchestras in the world.

We agree with petitioners that they may depreciate the Tourte bows under ACRS. ERTA was enacted partially to address and eliminate the issue that we are faced with today, namely, a disagreement between taxpayers and the Commis-

sioner over the useful lives of assets that were used in tax-payers' trades or businesses. With this "elimination of dis-agreements" purpose in mind, the Congress defined five broad classes of "recovery property", and provided the periods of years over which taxpayers could recover their costs of this "recovery property". Two of these classes, the 3-year- and 5-year-classes, applied only to personal property; the 3-year class included certain short-lived assets such as automobiles and light-duty trucks, and the 5-year class included all other tangible personal property that was not within the 3-year class. H. Conf. Rept. 97–215, at 206–208 (1981), 1981–2 C.B. 481, 487–488. Thus, under section 168 as added to the 1954 Code by ERTA, personal property that is "recovery property" must be either 3-year- or 5-year-class property. Sec. 168(c)(2) as added to the 1954 Code by ERTA ("Each item of recovery property shall be assigned to one of the following classes of property"). Although "3-year property" requires a taxpayer to determine whether the property had a class life under ADR of 4 years or less, the term "5-year property" is appropriately designed to include all other section 1245 class property.

Inasmuch as section 168(a) allows a taxpayer to deduct depreciation with respect to "recovery property", petitioners may deduct depreciation on the Tourte bows if the bows fall within the meaning of that term. The term "recovery property" is defined broadly under ERTA to mean tangible property of a character subject to the allowance for depreciation and placed in service after 1980. Accordingly, property is "recovery property" if it is: (1) Tangible, (2) placed in service after 1980, (3) of a character subject to the allowance for depreciation, and (4) used in the trade or business, or held for the production of income. Sec. 168(c)(1); *Noyce v. Commissioner,* 97 T.C. 670, 689 (1991); see also ERTA sec. 209(a), 95 Stat. 172.

The Tourte bows fit snugly within the definition of recovery property. First, it is indisputable that the Tourte bows are tangible property, and that they were placed in service after 1980. Thus, the first two prerequisites for ACRS depreciation are met. Second, petitioners regularly used the Tourte bows in their trade or business as professional violinists during the year in issue. Accordingly, we conclude that petition-

ers have also met this prerequisite for depreciating the Tourte bows.[9]

The last prerequisite for depreciating personal property under section 168 is that the property must be "of a character subject to the allowance for depreciation". The term "of a character subject to the allowance for depreciation" is undefined in the 1954 Code. Comparing the language that the Congress used in section 167(a) of the 1954 Code immediately before its amendment by ERTA, *supra* p. 254, with the language that it used in section 168(a) and (c)(1) as added to the 1954 Code by ERTA, *supra* pp. 255–257, we believe that the Congress used the term "depreciation" in section 168(c)(1) to refer to the term "exhaustion, wear and tear (including a reasonable allowance for obsolescence)" that is contained in section 167(a). See *Noyce v. Commissioner, supra* at 689. Accordingly, we conclude that the term "of a character subject to the allowance for depreciation" means that property must suffer exhaustion, wear and tear, or obsolescence in order to be depreciated. Accordingly, petitioners will meet the final requirement under section 168 if the Tourte bows are subject to exhaustion, wear and tear, or obsolescence.[10]

We are convinced that petitioners' frequent use of the Tourte bows subjected them to substantial wear and tear during the year in issue. Petitioners actively played their violins using the Tourte bows, and this active use resulted in substantial wear and tear to the bows.[11] Indeed, respondent's

[9] In this regard, we note that petitioners are both well-educated, full-time professional musicians who take pride in playing their music to the best of their abilities. The Tourte bows help petitioners to accomplish this goal and are essential tools of their trade.

[10] The Tourte bows will also be "section 1245 class property" if they are subject to exhaustion, wear and tear, or obsolescence. In this sense, the Tourte bows will constitute "property *of a character* subject to the allowance for depreciation provided in section 167" (emphasis supplied). See *supra* note 8. Accord *John R. Thompson Co. v. United States,* 477 F.2d 164, 169 (7th Cir. 1973) ("Except to the extent that they are subject to physical decay * * *, works of art are not depreciable"); *Associated Obstetricians & Gynecologists, P.C. v. Commissioner,* T.C. Memo. 1983–380 ("respondent admits that * * * [her position in Rev. Rul. 68–232, 1968–1 C.B. 79] would not prohibit depreciation deductions with respect to artworks if the physical condition of the property can be shown to limit or determine its useful life"), affd. 762 F.2d 38 (6th Cir. 1985).

[11] In this regard, we do not believe that the Tourte bows are so-called works of art. We define a "work of art" as a passive object, such as a painting, sculpture, or carving, that is displayed for admiration of its aesthetic qualities. See Webster's New World Dictionary 1539 (3d coll. ed. 1988). The Tourte bows, by contrast, functioned actively, regularly, and routinely to produce income in petitioners' trade or business. Although a computer utilized by a child to play games is not a depreciable asset, the same computer becomes a depreciable asset if it is used actively, regularly, and routinely by a data processor in his or her trade or business. By the same token, the Tourte bows could have been collector's items except for the fact that petitioners used them

expert witness even acknowledged at trial that the Tourte bows suffered wear and tear stemming from petitioners' business; the witness testified that the Tourte bows had eroded since he had examined them 3 years before, and that wood had come off them. Thus, we conclude that petitioners have satisfied the final prerequisite for depreciating personal property under section 168, and, accordingly, hold that petitioners may depreciate the Tourte bows during the year in issue. Allowing petitioners to depreciate the Tourte bows comports with the text of section 168, and enables them to match their costs for the Tourte bows with the income generated therefrom. Refusing to allow petitioners to deduct depreciation on the Tourte bows, on the other hand, would contradict section 168 and vitiate the accounting principle that allows taxpayers to write off income-producing assets against the income produced by those assets.

With respect to respondent's arguments in support of a contrary holding, we believe that respondent places too much reliance on the fact that the Tourte bows are old and have appreciated in value since petitioners acquired them. Indeed, respondent believes that this appreciation, in and of itself, serves to prevent petitioners from claiming any depreciation on the Tourte bows. We disagree; section 168 does not support her proposition that a taxpayer may not depreciate a business asset due to its age, or due to the fact that the asset may have appreciated in value over time. *Noyce v. Commissioner, supra* at 675, 691 (taxpayer allowed to deduct depreciation under section 168 on an airplane that had appreciated in economic value). Respondent incorrectly mixes two well-established, independent concepts of tax accounting, namely, accounting for the physical depreciation of an asset and accounting for changes in the asset's value on account of price fluctuations in the market.[12] Accord *Fribourg Naviga-*

---

actively, regularly, and routinely in their full-time business.

[12] Accounting for depreciation of assets is an annual offset to gross income by deductions that represent the exhaustion, wear and tear, or obsolescence of an income-producing asset. Depreciation occurs on a daily basis, and depreciation accounting reflects the daily diminution in value of the underlying asset through other than market conditions. Accounting for changes in the values of depreciable property because of market conditions, on the other hand, is reportable as gain or loss upon the sale of the depreciable asset. This concept accounts for the increase or decrease in the market value of an asset on account of fluctuations caused by inflation, scarcity, or the like; such fluctuations are independent of the decrease in value of an asset through depreciation. *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 277 (1966); *Macabe Co.*

*tion Co. v. Commissioner,* 383 U.S. at 277; *Macabe Co. v. Commissioner,* 42 T.C. 1105, 1109 (1964). Moreover, we find merit in petitioners' claim that they should be able to depreciate an asset that receives substantial wear and tear through frequent use in their trade or business. Simply stated, the concept of depreciation is appropriately designed to allow taxpayers to recover the cost or other basis of a business asset through annual depreciation deductions.[13]

We also reject respondent's contention that the Tourte bows are nondepreciable because they have value as collectibles independent of their use in playing musical instruments, and that this value prolongs the Tourte bows' useful life forever. First, it is firmly established that the term "useful life" under pre-ERTA law refers to the period of time in which a particular asset is *useful to the taxpayer* in his or her trade or business. *Fribourg Navigation Co. v. Commissioner, supra* at 277; *Massey Motors, Inc. v. United States,* 364 U.S. 92 (1960); sec. 1.167(a)–1(b), Income Tax Regs. Thus, the fact that an asset such as the Tourte bows may outlive a taxpayer is not dispositive of the issue of whether that asset has a useful life for depreciation purposes under pre-ERTA law. Second, the same argument concerning a separate, nonbusiness value can be made of many other assets. Such types of assets could include, for example, automobiles, patented property, highly sophisticated machinery, and real property. For the Court to delve into the determination of whether a particular asset has a separate, nonbusiness value would make the concept of depreciation a subjective issue and would be contrary to the Congress' intent to simplify the concept and computation of depreciation.

With respect to respondent's contention that petitioners must prove a definite useful life of the Tourte bows, we acknowledge that the concept of useful life was critical under pre-ERTA law. Indeed, the concept of useful life was necessary and indispensable to the computation of depreciation because taxpayers were required to recover their investments in per-

---

*v. Commissioner,* 42 T.C. 1105, 1109–1110 (1964).

[13] We note that the Congress enacted sec. 1245 in 1962 to minimize any perceived inequities that may have occurred due to the fact that a taxpayer's depreciation deductions offset his or her ordinary income, but the taxpayer's gain on the sale of the depreciable asset was reportable as capital gain. Under sec. 1245, taxpayers must report as ordinary income any gain on a sale of depreciable personal property to the extent of the prior depreciation that they have taken on the property. *Fribourg Navigation Co. v. Commissioner, supra* at 285.

sonal property over the estimated useful life of the property. Sec. 1.167(a)–1(a), Income Tax Regs. However, the Congress enacted ERTA, in part, to avoid constant disagreements over the useful lives of assets, to shorten the writeoff periods for assets, and to encourage investment by providing for accelerated cost recovery through the tax law. S. Rept. 97–144, at 47 (1981), 1981–2 C.B. 412, 425. See generally 1981 Bluebook, at 75. To these ends, the Congress created two short periods of years over which taxpayers would depreciate tangible personal property used in trade or business; the 3-year and 5-year recovery periods, respectively, are the *deemed useful life* of personal property. After the taxpayer has written off his or her asset over this 3-year or 5-year period, the taxpayer's basis in that asset will be zero; thus, the taxpayer will need to purchase a new asset in order to receive a future tax deduction with respect thereto. Respondent's argument that a taxpayer must first prove the useful life of personal property before he or she may depreciate it over the 3-year or 5-year period would bring the Court back to pre-ERTA law and reintroduce the disagreements that the Congress intended to eliminate by its enactment of ERTA. This the Court will not do.

Respondent mainly relies on *Clinger v. Commissioner,* T.C. Memo. 1990–459, and *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989), to support a holding contrary to the one that we reach today.[14] We find both of these cases distinguishable. First, in *Clinger,* the taxpayer was a professional portrait artist who painted in the style of her former teacher and well-known portrait artist, Alvin Gittins. Based on the taxpayer's belief that she could further her studies of Gittins, establish her credentials as a painter, and facilitate the marketing of her paintings, the taxpayer purchased a painting by Gittins and displayed it among her own paintings that she had hanging in her stu-

---

[14] Respondent also relies on sec. 1.168–3(a), Proposed Income Tax Regs., 49 Fed. Reg. 5957 (Feb. 16, 1984), and Rev. Rul. 68–232, 1968–1 C.B. 79. We find this reliance misplaced; neither proposed regulations nor revenue rulings are entitled to judicial deference. See, e.g., *Tandy Corp. v. Commissioner,* 92 T.C. 1165, 1170 (1989); *Natomas North America, Inc. v. Commissioner,* 90 T.C. 710, 718 n.11 (1988); *North Ridge Country Club v. Commissioner,* 89 T.C. 563, 579–580 (1987), revd. on other grounds 877 F.2d 750 (9th Cir. 1989). Moreover, we conclude that the Tourte bows are not "works of art" because, inter alia, the bows were used by petitioners in their trade or business as professional violinists. See *supra* note 11.

dio. The taxpayer claimed deductions under ACRS with respect to the purchased painting.

We sustained respondent's determination that the taxpayer was not entitled to deductions on the painting under ACRS. In so doing, we rejected the taxpayer's argument that the concept of useful life was eliminated with the enactment of ACRS, and accepted respondent's argument that a taxpayer must prove a determinable useful life. Our holding there, however, is distinguishable from the case at hand; unlike the Tourte bows, the painting in *Clinger* was not an asset that suffered substantial wear and tear through its regular, active, and physical use in the taxpayer's trade or business. To the extent, however, that respondent relies on a broad reading of *Clinger* to support her proposition that petitioners must prove *the* useful life of the Tourte bows in order to depreciate them, respondent misconstrues our holding in *Clinger.* In *Clinger,* the Court merely held that ACRS required that the taxpayer had to prove *a* determinable useful life of her passive business asset that suffered no discernible wear and tear. Determinable means "that can be determined". Webster's New World Dictionary 375 (3d coll. ed. 1988). Accordingly, once a taxpayer establishes that an asset is subject to exhaustion, wear and tear, or obsolescence, we can determine whether its useful life is 3-year- or 5-year-class property under ACRS. As coherently and succinctly stated by this Court in a Court-reviewed opinion:

Availability of deductions for depreciation on tangible property in this case is dependent solely upon compliance with section 168, which has only two requirements for deduction of depreciation. First, the asset (tangible) must be of a type which is subject to wear and tear, decay, decline, or exhaustion. * * * Second, the property must be used in the taxpayer's trade or business or held for the production of income. * * * The language of the section is unequivocal. [*Noyce v. Commissioner,* 97 T.C. at 689.]

*Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989), is also distinguishable. In *Browning,* the taxpayer was a musician who performed in nightclubs and bars and for private engagements. Prior to and during 1980 and 1981, the taxable years in issue there, the taxpayer purchased several expensive antique violins, including a Ruggeri, a Stradivarius, and a Gabrielli. The Ruggeri and the Stradivarius violins were purchased in 1978

and 1979, respectively, and were subject to the pre-ERTA rules for depreciation. The Gabrielli violin was purchased in 1981, and was subject to ACRS. During 1980 and 1981, the taxpayer claimed depreciation deductions with respect to the Ruggeri and Stradivarius violins; the taxpayer amended his petition in this Court to claim that section 168 of the 1954 Code, as added by ERTA, allowed him to deduct depreciation on the Gabrielli violin for his 1981 taxable year.

The Court in *Browning* sustained respondent's determination that the taxpayer was not entitled to any depreciation deductions on the violins. In so doing, the Court first stressed that the taxpayer had presented no credible evidence to support a contrary holding with respect to the Stradivarius violin. Indeed, neither the taxpayer nor his wife testified at trial; we also found unpersuasive the evidence that the taxpayer did present at trial, an expert's report and that expert's testimony. With respect to the other two violins (including the one subject to ACRS), we held for respondent because the taxpayer failed to present any evidence with respect to those violins.

The record in the instant case, by contrast to the record in *Browning,* is replete with evidence showing clearly that the Tourte bows suffered substantial wear and tear while petitioners used them in their trade or business. Accordingly, unlike the taxpayer in *Browning,* petitioners have met their burden of proving wear and tear to their business asset. To state the obvious, violin bows are subject to wear and tear when in use by a professional violinist. Indeed, as stated by Publilius Syrus circa 42 B.C.: "The bow too tensely strung is easily broken." Bartlett, Familiar Quotations 1103 (12th ed. 1951).

We have considered all other arguments made by respondent and find them to be without merit.

To reflect concessions by the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

PARKER, SWIFT, WRIGHT, PARR, WELLS, RUWE, and COLVIN, *JJ.,* agree with this majority opinion.

CHIECHI, *J.,* dissents.

RUWE, *J.*, concurring: In this case, section 168 is being applied to violin bows used by professional violinists. Everyone would ordinarily agree that such an asset is the "type" of asset that would be subject to an allowance for depreciation.

Under section 167, depreciation was allowed over the useful life of the asset in order to allow taxpayers to deduct the anticipated loss in value attributable to wear and tear. This, in turn, required the often difficult task of proving the useful life and salvage or residual value of the asset. In a significant step in the direction of tax simplification, both of these requirements were eliminated by section 168, which specifies the number of years over which the cost of certain types of assets may be deducted and eliminates the need to calculate salvage or residual value in order to determine the expected economic loss.

Everyone seems to favor tax simplification until the simplified law is actually applied to a real set of facts and produces a less-than-perfect result. The dissenting opinions would resurrect the obligation to establish an asset's actual expected useful life and the actual expected decrease in value over that life, in order to qualify for a section 168 deduction. It is unclear whether the dissenters intend to limit their analyses to assets that are "works of art", whatever that term may mean. However, their legal theories would seem to apply to any case where the Commissioner raises the useful life and value issues.

I can understand the dissenters' concern that section 168 might allow an asset to be written off over a period much shorter than its actual useful life and that the entire cost might be deducted despite the fact that there might be no actual economic decrease in value. However, that is the price of the tax simplification implicit in section 168.

PARKER, COHEN, SWIFT, WRIGHT, PARR, WELLS, and BEGHE, *JJ.*, agree with this concurring opinion.

---

BEGHE, *J.*, concurring: For the reasons set forth in my separate opinion in the companion case, *Liddle v. Commis-*

*sioner,* 103 T.C. 285, 306 (1994) (Beghe, J., dissenting), I concur in the result in this case.

---

HAMBLEN, *C.J.,* dissenting: I must disagree with the majority opinion. I respectfully submit that the basis for the majority's allowance of a depreciation deduction in this instance is sophistical and wrong. The majority would create a tax shelter for musicians, which, in my judgment, is based on incorrect legal analysis and some findings of fact that are unsupported by the record. The statutory interpretation of sections 167 and 168 is wrong in this context. Pertinent legislative history regarding determinable useful life is ignored. The antique violin bows are treasured "works of art" that for 71 years the Internal Revenue Service has treated, with congressional acquiescence, as nondepreciable property because as instruments and collectibles they have an indeterminable useful life. The majority's holding is contrary to legal precedent. See *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989); see also *Clinger v. Commissioner,* T.C. Memo. 1990–459.

## I. *Legal Analysis*

### A. *Statutory Construction*

The threshold issue in this case is whether the antique Tourte bows are property "of a character subject to the allowance for depreciation provided in section 167" within the definition of "recovery property" in section 168. Secs. 1245(a)(3), 168(g)(3). The majority opinion concludes, as a matter of law, that if a taxpayer uses in his trade or business tangible personal property which suffers some wear and tear, irrespective of whether the wear and tear can be restored by ordinary maintenance, irrespective of whether it has a determinable useful life, and irrespective of whether it declines in value, the taxpayer is entitled to depreciate the property under ACRS (section 168) by treating it as falling within one of the five broad classes of "recovery property". I cannot agree. That conclusion contradicts the basic underpinnings of the depreciation allowance and the holdings of this Court and other courts. With the exception of the tangibility requirement for ACRS, the definition of "recovery property" is virtually iden-

tical to the definition of property eligible for depreciation under the pre-ACRS methods. Sec. 167(a). Because the basic definition resembles the pre-ACRS definition of depreciable property, certain principles and judicial interpretations established thereunder are of value in determining what property meets the basic ACRS "recovery property" definition.

It is true that section 168 represents a restructuring of the concept of depreciation deductions and that Congress has de-emphasized the concept of useful life and abandoned the concept of salvage value. But Congress did not release the concept of depreciation from the moorings of useful life. In *Newark Morning Ledger Co. v. United States*, 507 U.S. ___, 113 S. Ct. 1670, 1680 (1993), the Supreme Court noted that "The entire justification for refusing to permit the depreciation * * * evaporates, however, when the taxpayer demonstrates that the asset in question wastes over an ascertainable period of time." The corollary is that, if property suffers no waste and lacks a determinable useful life, it is not depreciable. *Tunnell v. United States*, 512 F.2d 1192 (3d Cir. 1975); *S.S. Ballin Agency, Inc. v. Commissioner*, 446 F.2d 554 (3d Cir. 1971), affg. T.C. Memo. 1969–203; *Westinghouse Broadcasting Co. v. Commissioner*, 309 F.2d 279 (3d Cir. 1962), affg. 36 T.C. 912 (1961); *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463, 479 (1988), affd. 919 F.2d 1492 (11th Cir. 1990); *Judge v. Commissioner*, T.C. Memo. 1976–283.

Although section 168 effects significant changes in the calculation of the depreciation allowance, useful life remains a hallmark of the basic concept of depreciation in both sections 167 and 168. First, the determination with respect to the class of recovery property cannot be made without reference to the useful life of the property. Second, to be "recovery property" under either section 168(c)(2)(A) or (B), the property must be "section 1245 class property" that, in turn, is defined as "property of a character subject to the allowance for depreciation provided in section 167". Sec. 1245(a)(3). Property depreciable under section 167 must be subject to waste and have a determinable useful life. See *Browning v. Commissioner, supra.* While the majority opinion apparently acknowledges that this is correct as far as section 167 is concerned, it ignores this requirement in discussing section 168. As we stated in *Clinger v. Commissioner, supra,* "the concept

of useful life was not eliminated by the enactment of ACRS under ERTA; hence * * * petitioner must establish that an asset used in a trade or business has a determinable useful life". Accord *Arkla, Inc. v. United States,* 27 Fed. Cl. 226 (1992).

The question of whether a tangible asset used in a trade or business is subject to wear and tear is of course a starting point for determining whether an asset is depreciable. But it is not the final determinant. The premise underlying the depreciation allowance is that wear and tear or obsolescence causes a corresponding *reduction in the value* of an asset and *diminishes its useful life.* The end product of the depreciation allowance is the taxpayer's recovery of capital expenditures (costs) made in acquiring a wasting asset used in a trade or business or held for the production of income. See *Noyce v. Commissioner,* 97 T.C. 670, 688 (1991). Depreciation is therefore keyed to wear and tear or obsolescence because they generally cause corresponding reductions in the useful life and value of property.

Consequently, sections 167 and 168 are connected or linked so that an asset, such as a Tourte bow, that has an indeterminable useful life is not depreciable. It seems to me that the majority opinion has twisted these depreciation provisions beyond the contours of their clear and unambiguous language so as to defeat the plain purpose of Congress.

B. *Legislative History, Proposed Regulations, and Rulings*

The legislative history of section 168, as revealed in the "Overview" section of the Senate Finance Committee (S. Rept. 97–144 (1981), 1981–2 C.B. 412) and the House Ways and Means Committee (H. Rept. 97–201 (1981), 1981–2 C.B. 352) reports states:

In general, property is depreciable if it is (1) used in a trade or business or for the production of income, and (2) subject to wear and tear, decay or decline from natural causes, exhaustion, or obsolescence. Land, goodwill, stock, and *other assets* that do not have a determinable useful life and that do not decline in value predictably are not depreciable. * * * [S. Rept. 97–144, *supra,* 1981–2 C.B. at 421; emphasis supplied.]

Substantially similar language is used in the conference committee report, H. Conf. Rept. 97–215 (1981), 1981–2 C.B. 481, 487, under the heading "Eligible Property", which states

that "ACRS does not apply to (1) property not depreciated in terms of years". Moreover, the Joint Committee on Taxation summary (the so-called Blue Book) states that ACRS "does not change the determination under prior law as to whether property is depreciable or nondepreciable". Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 77 (J. Comm. Print 1981). The majority opinion essentially ignores these statements. The Joint Committee on Taxation summary likewise reiterates the statements made in the committee reports that assets that do not decline in value on a predictable basis or that do not have a determinable useful life are not depreciable.

Section 1.168–3(a)(1)(ii), Proposed Income Tax Regs., 49 Fed. Reg. 5957 (Feb. 16, 1984), tracks and is entirely consistent with the legislative history. It provides in part: "Property is considered recovery property only if such property would have been depreciable under section 167. ACRS does not apply to * * * works of art". I think Congress was aware of the longstanding rulings of the Internal Revenue Service that "works of art" are not depreciable. The term "other assets" would certainly include valuable antique violin bows.[1]

Depreciation is defined as a loss in the value of property over the time the property is being used. In *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 10 (1974), the Supreme Court commented as follows:

Over a period of time a capital asset is consumed and, correspondingly over that period, its theoretical value and utility are thereby reduced. Depreciation is an accounting device which recognizes that the physical consumption of a capital asset is a true cost, since the asset is being depleted. * * *

In 1985, bow 1 was purchased for $30,000 and appraised at $35,000; bow 2 was purchased for $21,500 and appraised at $25,000. In 1993, at the time of trial, the bows were insured for $45,000 and $35,000, respectively, based on a 1990 appraisal by Yung Chin, a repairer and dealer of fine bows. Petitioners' costs were simply not used up over the claimed 5-year period. Indeed, Richard Simon could not say how long the bows would be usable.

---

[1] See A.R.R. 4530, II–2 C.B. 145 (1923), superseded and restated by Rev. Rul. 68–232, 1968–1 C.B. 79.

## C. *Legal Precedent*

The majority opinion has dubiously attempted to distinguish *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989), and *Clinger v. Commissioner,* T.C. Memo. 1990–459. Candor requires that we not try to discard or overrule them sub silentio. In *Browning,* we held that the Stradivarius, Ruggeri, and Gabrielli violins were nondepreciable because the taxpayer, a professional musician, could not prove they had a determinable useful life. In affirming our decision, the Court of Appeals stated:

They [the taxpayers] have failed to show any real decrease in value. The Tax Court did not clearly err when it found that the Brownings did not present sufficient evidence to refute the Commissioner's ruling that the violins would actually appreciate in value over time rather than depreciate.

       \*    \*    \*    \*    \*    \*    \*

As the Tax Court noted, antique violins such as a Stradivarius are considered collectible items and not all purchasers need necessarily be professional musicians. Therefore, the violins have a value independent of their tonal qualities and that value may extend their useful lives which makes the violins more like pieces of art. \* \* \*

  [890 F.2d at 1086–1087.]

In *Clinger v. Commissioner, supra,* relating to a Gittins oil painting purchased by a professional artist for use in her studio, this Court specifically held:

Accordingly, it is our opinion that the concept of useful life was not eliminated by the enactment of ACRS under ERTA; hence, where respondent has determined that a taxpayer's assets have no determinable useful life and consequently are not depreciable, petitioner must establish that an asset used in a trade or business has a determinable useful life and prove the class of recovery property to which it is assigned. \* \* \*

See, e.g., *Andrew Crispo Gallery, Inc. v. Commissioner,* 16 F.3d 1336, 1342 (2d Cir. 1994), affg. in part, vacating in part and remanding T.C. Memo. 1992–106.

The majority opinion relies principally on one case, *Noyce v. Commissioner,* 97 T.C. 670 (1991), which stands in sharp contrast to and is distinguishable from *Browning* and *Clinger.* In *Noyce* we concluded that the taxpayer's use of his private airplane and payment of related expenses in the course of his employment were part of his trade or business of being a corporate official. Thus, it was held that he may

deduct depreciation and expenses related to such travel to the extent such amounts exceed amounts reimbursable under his employer's policy. *Noyce* is distinguishable from this case in several respects.

(1) The majority in *Noyce* pointed out that section 168 has two requirements:

First, the asset (tangible) must be of a type which is subject to wear and tear, decay, decline, or exhaustion. Sec. 168(c); sec. 1.167(a)–2, Income Tax Regs. Second, the property must be used in the taxpayer's trade or business or held for the production of income. Sec. 168(c)(1). * * * [97 T.C. at 689.]

At issue in *Noyce* was the second section 168 requirement—whether the taxpayer used the airplane in his trade or business. It was undisputed that, if properly used, the airplane suffered wear and tear and could be depreciated. Indeed, the Commissioner's Rev. Proc. 87–56, 1987–2 C.B. 674 (as clarified and modified by Rev. Proc. 88–22, 1988–1 C.B. 785) specifically lists airplanes (except those used in commercial or contract carrying of passengers or freight) as constituting 5-year-class property under section 168. The Commissioner did not argue that the airplane was not depreciable property under section 167, but only that the depreciation deduction was dependent on satisfaction of the section 162 requirements. We rejected that argument. By contrast, the key issue in the present case is the first section 168 requirement—whether the Tourte bows are the type of property subject to depreciation. Petitioners have not shown that they are.

(2) The majority opinion points out that the taxpayer in *Noyce* was allowed to deduct depreciation on an airplane that appreciated in economic value. Further, it stated that "allowable deductions for depreciation will often not be reflective of economic depreciation." 97 T.C. at 688. Both of these statements are correct, but they cannot be used to wholly disregard the statutory requirement that an asset be a wasting asset. As stated in *Noyce,* "Depreciation is not really an 'expenditure' but an allowance based on a presumed wasting of a previous capital investment." *Id.* While economic and statutory depreciation may not be coincident, they share the factual premise of a wasting asset. Petitioners have not proved the presence of such an asset in this case.

To be sure, the deduction for depreciation is designed to protect taxpayers from an economic loss, "not to make taxpayers a profit thereby". *Massey Motors, Inc. v. United States,* 364 U.S. 92, 101 (1960); see *Hibernia Natl. Bank v. United States,* 740 F.2d 382, 386 (5th Cir. 1984) ("[W]here it is clear that the taxpayer will suffer no economic loss, no deduction is allowable.").

## D. *Work of Art Vel Non*

The majority opinion characterizes the Tourte bows as not being "works of art" because they are actively and regularly used in petitioners' trade or business as professional musicians. I would not characterize a "work of art" so narrowly. I think the term should be given a broad, expansive meaning. One definition of a "work of art" contained in Webster's New 20th Century Dictionary (unabridged 1983) is "anything beautifully made, played, sung or acted". That definition would certainly include an antique musical instrument or bow, a Shakespearean play, a Verdi opera, or a Navajo rug. And "art" is defined in the same dictionary as "products of creative work". In the final analysis the answer probably lies in the eyes of the beholder or owner. In any event, this Court has rejected the notion that "works of art and commercial equipment necessarily are mutually exclusive concepts." *London Displays Co. v. Commissioner,* 46 T.C. 511, 514 (1966). Even if used in a trade or business, a "work of art" retains its character as a work of art because it does not have a determinable useful life and generally does not decline in value over a predictable period. See *Clinger v. Commissioner, supra; Associated Obstetricians & Gynecologists, P.C. v. Commissioner,* T.C. Memo. 1983–380, affd. per curiam 762 F.2d 38 (6th Cir. 1985). To say the least, I expect the Smithsonian curator of musical instruments would be shocked to learn that a Stradivarius violin or a Tourte bow is not regarded as a treasured "work of art". Consequently, in my view, the Tourte bows in this case should be considered as a type of property which is not subject to depreciation. In cases of this kind it seems that our role should begin and end with assuring that the Commissioner's authority to implement the congressional mandate has been exercised in a reasonable manner. See *United States v.*

*Correll,* 389 U.S. 299 (1967). I respectfully submit that the majority has not done so.

E. *Matching*

The majority opinion focuses on the concept of matching income with the cost of producing that income in allowing the depreciation. The Supreme Court has noted that "it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use * * * of the asset to the periods to which it contributes." *Massey Motors, Inc. v. United States, supra* at 104. Although the matching concept is perhaps a useful analogy vis-a-vis the depreciation deduction, it is basically an accounting concept and not a concept regarding depreciable property. Moreover, the concept of matching is certainly not a guiding principle of construction of tax statutes or tax policy in every situation. One need only look to the fate of former sections 452 and 462, which were included in the original 1954 Code, ch. 736, 68A Stat. 3, 152, 158, to be disabused of that notion. In repealing these sections Congress determined that, regardless of their adherence to sound accounting principles, the provisions were "not acceptable for tax purposes." See *American Automobile Association v. United States,* 367 U.S. 687, 695 (1961).

Even if there were some reassurance to be found in the concept of matching, that reassurance cuts the other way. The concept of matching income and expenses would indicate that when the income-producing asset retains its value, the taxpayer has not expended the purchase price, but rather has merely converted it from cash to an asset of equal value. Depreciation, in a sense, departs from realization principles, allowing a taxpayer to recognize a loss in the value of an asset without the requirement of disposition. But depreciation assumes that the asset will be consumed and decline in value over a predictable period of time. When an asset increases in value, as here, there is no loss or waste to match against income, a circumstance which, to say the least, stands the concept of matching revenue and cost on its

head.[2] See Johnson, "Soft Money Investing under the Income Tax", 1989 U. Ill. L. Rev. 1019, 1040–1041 (1990):

we can expect * * * [nonwasting assets] to give infinite streams of income, or at least such indefinite and long streams of income that we can presume for practical purposes that they are infinite. * * * Accordingly, the taxpayer has the same asset in each subsequent year as he or she had immediately after purchase—an infinite line of income.

* * * As long as the asset retains its value, a purchaser has not expended the purchase price, but rather just converted it from cash to an asset—just as the original purchase merely converted wealth from cash to an asset. [Fn. ref. omitted.]

See also Dodge, The Logic of Tax 252 (1989).

## II. *Factual Analysis*

There are some intermediate and ultimate findings of fact and conclusions that concern me because they appear to be incorrect or unsupported by the record.

### A. *Wear and Tear of Violin Bows*

The "wear and tear" concept relates to the physical life of tangible property. The physical life must be lessened by wear and tear that cannot be corrected by regular maintenance. See *Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 167 (1934) (depreciation represents "the loss, *not restored by current maintenance,* which is due to all the factors causing the ultimate retirement of the property. These facts embrace wear and tear, decay, inadequacy, and obsolescence." (Emphasis added.)).

The majority opinion finds that the "petitioners' frequent use of the Tourte bows subjected them to *substantial* wear and tear during the year in issue." Majority op. p. 260 (emphasis added). While there is obviously some degree of wear and tear to any wood instrument or bow, I doubt whether these particular bows suffered "substantial" wear and tear. Richard Simon, whose testimony was somewhat inconsistent, said the bows were kept in "perfect condition", and that the bows showed "a very minuscule amount of wear". Fiona Simon testified that she avoided "abusive wear and tear to these fine bows" and that "you cannot avoid some

---

[2] Moreover, where, as here, petitioners were allowed to deduct expenses for repairing the bows, there could be a double deduction if depreciation were also allowed.

wear and tear, but we do try and minimize it by keeping the bows in a good state of repair"; and when asked whether the bows with proper care would last throughout her lifetime, she answered, "I would hope, but who knows?" Yung Chin, the bow repairer, stated that the stick was "worn down somewhat" and that there was "a slight amount of use shown on the handle of the bow". But he said there were no cracks or damage to the bows and that they were fully capable of being used in a professional capacity. Obviously the bows were in excellent condition at the time of trial when Judge Laro permitted both petitioners to play their violins with the two Tourte bows in a courtroom demonstration. That occurred 8 years after they were first used by petitioners.

When asked about the present playability of the bows, Richard Simon testified on cross-examination:

Q. Do both François Tourte bows play as well today as they did when you played them in '85?

A. That's a very interesting question. I can't answer that. I have no idea. For me, they play better, but I—I couldn't tell you. I'd have had to have recorded myself playing them and then have a comparison recording under the same conditions, which—

Q. Do the François Tourte bows produce the same tonal quality today as they did in 1985?

A. I can't answer that question either. I don't know. I hope they do.

Q. When you purchased the bows in 1985, how long did you think you would be playing with them?

A. I didn't. Let me—let me say one thing. You know, there are some people that have really conniving minds and go through all kinds of mental detours. I bought a bow because I bought a bow. I bought a bow because I loved it, and the thing I thought about was living with that bow and that bow living with me. That's all I thought about.

Q. Do you intend to use the François Tourte bows in future performances?

A. As long as I can protect it from anything happening to it, absolutely.

Much of Richard Simon's testimony regarding the "wear and tear" to the bows related to the frog, the ferrule (the screw), and the horsehair. When petitioners acquired the bows, the original frog and ferrule had to be replaced because they were not usable. However, petitioners did not discard them. They put them in a vault for safekeeping so that, as Richard Simon testified, they could protect their investment. Apparently the frog and the ferrule have to be repaired or replaced periodically, and the horsehair is replaced about

every 18 months. It is the stick that is most valuable, and as long as it is properly maintained it will be usable for an indefinite period of time. Even assuming the bows may eventually wear out, the unanswered question is how long this would take. They have lasted 175 years so far and may be good for another 175 years, if properly maintained. If ever they do cease to be usable, they may well continue to have independent value as collectibles. This is supported by the testimony of Wiley Grant, respondent's expert witness, who was also a witness in *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989).

B. *Appendix Photograph*

The appendix, majority op. p. 266, which was Exhibit 15 admitted into evidence, is a copy of a photograph of a violin bow that appears to have had abusive treatment. Respondent's counsel objected to its admission. The picture, which was admitted into evidence, was taken from a book objected to by respondent's counsel and not admitted into evidence. The photograph is irrelevant. It is not a photograph of either of the François Tourte bows in issue or of another Tourte bow. The maker of the bow is unknown. We do not know when it was made. We do not know its age. We do not know what kind of wood was used to make it. We know nothing about its condition, or how long it was used. Richard Simon assumed that it was abused or damaged, possibly by perspiration and excessive pressure. The testimony of Richard Simon on re-direct examination was as follows:

THE WITNESS: May I just add that the reason that picture was included in this book was as a warning to people what can happen to a bow if you abuse it and you don't take extreme precautions.

THE COURT: Are you able to speculate over how much time it would take in order for a bow to be eroded in the manner in which that was?

THE WITNESS: Not and be honest about it.

The testimony of Richard Simon on re-cross-examination was as follows:

Q. Mr. Simon, referring to the photograph which has been identified as Petitioners' Exhibit 15, do your François Tourte bows look like that bow?

A. I wouldn't have bought them if they did, obviously, nor would anybody else. They would be garbage.

Q. Do they look like that bow today? I mean, present day, do your François Tourte bows look the same as that photograph?

A. You mean do they look absolutely identical to that? No. But they look partly like that, of course, because they suffer wear. It's a very minuscule amount of wear, but they suffer wear.

Q. They don't suffer the same amount of wear as indicated in that—

A. They haven't been played as long as those bows have.

Q. Do you know how long—how old that bow in the photograph is?

A. Sure. I'd estimate that bow was played for about 20 years or 25 years.

Q. Do you know what period that bow dates from?

A. I know nothing about it. It's not identified.

Q. Do you know how much the bow was probably played?

A. It's not identified. I mean, frankly, I'm not a bow expert. I'm just looking at a picture, and I recognize what I'm seeing, but I can't identify anything—it's beyond recognition at this point.

In short, it appears that the majority has inferred that this picture of an unidentified and abused bow is similar to the bows owned by petitioners. The picture is, purely and simply, not evidence of wear and tear to petitioners' Tourte bows.

## C. *Footnote 5*

The record does not show how many years bow 1 was in collections or how many years it was used before it was placed in a collection. Based solely on Richard Simon's uncorroborated testimony, I would not draw the inference, as the majority has, majority op. note 5, that bow 1 (or bow 2) "had never been used prior to petitioners' purchase of it." On cross-examination Richard Simon testified as follows:

Q. When was the first time the François Tourte bows that you purchased were played on?

A. When is the first time? I couldn't tell you.

Q. So, you don't know—do you know whether they were played on before you played—

A. I have no information about the bows except that I own them and what I've told you already.

All Richard Simon knows is that the bows he purchased from Moes & Moes, Ltd., in 1985 were previously in the Hans Weissar collection in California and that Weissar had acquired them from another person who had a world-famous collection. He does not know how long they were in these collections or whether they were used before he purchased them. Surely, the fair inference to draw from these facts is

that François Tourte made both bows as functional tools for musicians and they were so used in their early years.

### D. *Determinable Useful Life*

The record in this case clearly shows that the Tourte bows have no determinable[3] useful life. Nobody knows how long they will last as either usable works of art in petitioners' hands or ultimately as collectibles.

Nowhere in Richard Simon's testimony does he say how many years the bows may last or how long they will be usable if regularly and carefully maintained. His principal comment regarding petitioners' use of the bows was that it is "a very great responsibility for us to preserve the stick for future generations".[4] When Fiona Simon, on cross-examination, was asked how long a bow would last, she responded, "I have no idea."

Yung Chin, the bow repairer, likewise could not determine the useful life of the bows. He testified on re-direct examination as follows:

Q. Do you have any opinion as [to] the useful life or the longevity of a bow?
A. I don't believe you can put a specific number on that.
Q. It's not possible to determine with any certainty at all the—the—the useful life of a bow.
A. I would say that's correct, what you said. I mean accidents happen.
Q. Okay. But—okay. So, the answer is no, that you cannot put a useful life to it.
A. If you ask—if you—if you—I can't put a definite number and say the bow will last 25 years. That I can't do.

Finally, Wiley Grant, respondent's expert, stated in his report that the bows were treasured works of art that had

---

[3] Determinable means "that can be determined, decided, or ascertained with positiveness". Webster's New 20th Century Dictionary (unabridged 1983).

[4] It is interesting to note the following colloquy between the Court and Richard Simon about his Amati violin:

THE COURT: Well, let's just take the case of your violin for the moment. It began to be played on in 1926. What is its useful life if it were played on three times a week, approximately, before it's played out?
THE WITNESS: I don't know. I haven't had it long enough.
THE COURT: Okay.
THE WITNESS: But I do an awful lot of playing on it. Violins are more—
THE COURT: But are we talking a matter of decades, or are we talking periods longer than that?
THE WITNESS: Well, I think we may be talking about a period of perhaps as much as 100 years.

no determinable useful life. Who can say with any degree of certainty how long these bows will last if given reasonable care?

## III. *Conclusion*

The Tourte bows are usable and treasured works of art whose physical life and use to petitioners were not lessened by wear and tear that could not be restored by current maintenance. Their cost was not being consumed or used up over a determinate period. They have inherent and independent value as collectibles that may remain for centuries. Based on the foregoing legal and factual analysis of this case, I would hold that the Tourte bows were not of a character subject to the allowance for depreciation.

CHABOT, JACOBS, WHALEN, and HALPERN, *JJ.*, agree with this dissent.

---

GERBER, *J.*, dissenting: I must, to some extent, agree and disagree with both the majority's view and Chief Judge Hamblen's minority view. Both views are thoughtful, but each approach unnecessarily results in taxpayers' being entitled to all or none of the depreciation claimed. Both positions fail to consider that the bows may have two separate attributes—recoverable or depreciable and intrinsic attributes. If both are considered, the results that the majority and minority views advocate could, to some extent, be achieved. As I see this issue, under either section 167, permitting "a reasonable allowance for the exhaustion, wear and tear", or section 168, permitting depreciation for specific categories of "recovery property", a taxpayer should not be entitled to a depreciation deduction for intrinsic value, which is generally not subject to wear and tear and/or makes the life of the object indeterminable. The facts reveal, and neither viewpoint denies, that the bows are being subjected to wear and tear due to their use by professional musicians. It is also factually indisputable that, in spite of their use, the bows continue to increase in value from the original purchase price because of their unique qualities. The crucial point, which has not been addressed, concerns the effect of the wear and tear upon the intrinsic value inherent in the asset.

The majority reaches the conclusion that each entire bow constitutes recovery property as defined in section 168(c)(1). Majority op. pp. 259–260. I agree that the bows are tangible property placed in service after 1980, and that the bows were used in petitioners' trade or business. I do not agree, however, that petitioners have shown that all of the property is of a character subject to the allowance for depreciation. Admittedly, some portion of the bows is subject to wear and tear, but not the intrinsic value that may exist even if the bows can no longer be used as bows. The burden is on petitioners to show which portion of the bows is subject to wear and tear and, therefore, recovery property.

There are numerous situations in the tax law where property is composed of both depreciable and nondepreciable portions. One example of this concept may be found in situations where a business is purchased and some portion of the purchase price may be attributable to goodwill—the nondepreciable intrinsic value of a business. *Ithaca Indus., Inc. v. Commissioner,* 97 T.C. 253 (1991), affd. 17 F.3d 384 (4th Cir. 1994). More specifically, our Court has considered the intrinsic value in works of art and musical instruments and not permitted depreciation attributable to that aspect. *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989); *Clinger v. Commissioner,* T.C. Memo. 1990–459. On several occasions we have delineated the existence of depreciable business use and nondepreciable personal use in the same property. See, e.g., *International Artists, Ltd. v. Commissioner,* 55 T.C. 94 (1970); *Gudmundsson v. Commissioner,* T.C. Memo. 1978–299. Finally, and by way of analogy, bifurcation of property into depreciable and nondepreciable portions is entrenched in the tax treatment of improvements to realty, which may be depreciable even though the land upon which they rest is not subject to depreciation.

To better illustrate the concept of intrinsic value, let us assume that Elvis Presley had purchased a guitar for $1,000. Due to his fame, however, the value of the guitar immediately increases to $11,000. If Elvis Presley had used the guitar in his business, he would have been entitled to depreciate the $1,000 amount, either over its useful life or in accordance with its section 168 class life, as may have been appropriate. If, however, another musician purchases Elvis'

guitar for $11,000, the portion of the guitar which would be subject to wear and tear or be recovery property would be about $1,000, more or less, depending upon how much Elvis had used it and/or the cost of a similar quality guitar at the time of purchase. The fact that it had been Elvis' guitar will sustain a premium value which is attributable to the guitar's intrinsic collector's value. Even if Elvis' guitar became unusable for commercial purposes, collectors would be willing to pay for the intrinsic value because it had belonged to Elvis. Usually, that value increases with time due to increased uniqueness attributable to scarcity or increased popularity. That intrinsic value could be affected by wear and tear, but the wear and tear will not necessarily eliminate the intrinsic value. Accordingly, under section 167 the remaining intrinsic value would be the equivalent of "salvage value". Because section 168 does not consider salvage value, the intrinsic value should not be considered recovery property.

These same principles apply to the bows under consideration. Some portion of the value and purchase price is attributable to the collector's value and is not recovery property within the meaning of section 168.[1] Although Congress, by enacting section 168, intended to simplify the classification of depreciable property and permit shorter periods of writeoff, there was no intent to permit the writeoff of the portion of property attributable to the intrinsic collector's value of unique property. The burden rests with taxpayers to show that portion of the property which is depreciable or recovery property and which portion is intrinsic or investment. Petitioners in this case have not shown the cost portion or value of the bows which is subject to wear and tear and, accordingly, must fail here. Admittedly, it would be unfair to hold that petitioners did not have some depreciation attributable to their use of the bows. It would be equally unfair (to other taxpayers) to permit petitioners to write off the intrinsic value which is unaffected by wear and tear or use.

The majority's holding permits the opportunity for substantial unintended abuse. Taxpayers will be able to depreciate items with current business utility and intrinsic collector's value and, after 3 or 5 years, have the tax benefit of the

---

[1] Taxpayers may be able to show that their use of an asset with both recovery property and intrinsic attributes would render the entire cost, including some or all of the intrinsic portion, valueless. Petitioners, however, have not shown that to be the case here.

entire cost, at a time when the value of the item has not decreased or may have increased. The process may be duplicated over and over, providing substantial writeoffs with the cost borne by the public fisc. Ultimately, the taxpayer accumulates numerous of these collector's items which are passed on to future generations because of their intrinsic collector's value, which is likely to have substantially appreciated.

For the reasons expressed, I respectfully dissent.

---

HALPERN, *J.,* dissenting: I agree with Chief Judge Hamblen, and I have joined his dissent. I have set forth my own views on the law here involved in *Liddle v. Commissioner,* 103 T.C. 285, 301 (1994) (Halpern, J., dissenting). Briefly stated, I believe that, to claim recovery property within the meaning of section 168(c)(1), petitioners would have to show not only that the bows here in question are subject to wear and tear but also that they have determinable useful lives (i.e., useful lives capable of being settled, fixed, or determined). I do not believe that they have done so. I write separately, however, only to address the suggestion of allocation raised by Judge Gerber.

Judge Gerber suggests that the bows are dual use property, having utility both as playables and as collectibles. Judge Gerber recognizes that the utility of the bows as collectibles will not be exhausted in any fixed or determinable period. He assumes that their utility as playables will be exhausted in a fixed period, which can be shown. Judge Gerber would allow a deduction under section 168 with respect to a taxpayer's basis in such dual use property properly allocated to the property's utility as a playable.

To be sure, section 1.167(a)–2, Income Tax Regs., provides:

The depreciation allowance in the case of tangible property applies only to that part of the property which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence. * * *

See sec. 1.168–2(d)(2)(ii), Proposed Income Tax Regs., 49 Fed. Reg. 5945 (Feb. 16, 1984) (similar).

We have allowed less than a full allowance for the exhaustion, wear and tear, and obsolescence of property where only

a portion of the property was used in a trade or business or held for the production of income. See, e.g., *International Artists, Ltd. v. Commissioner,* 55 T.C. 94 (1970) (depreciation deduction allowed to the extent premises were used for business purposes and disallowed to the extent used for personal purposes); *Noyce v. Commissioner,* 97 T.C. 670 (1991) (similar allocation under ACRS, with respect to an airplane). It seems to me a different thing, however, to say that property can wear out for one purpose but not another, so that, in effect, we should treat the taxpayer as having purchased two pieces of property rather than one. We have characterized as "bizarre" the suggestion that the owner's life expectancy should determine the depreciable useful life of an asset whose inherent value does not terminate upon the owner's death. *Clinger v. Commissioner,* T.C. Memo. 1990–459 (quoting *Coussement v. Commissioner,* T.C. Memo. 1966–179, affd. 391 F.2d 227 (6th Cir. 1968)). Judge Gerber would allow petitioners to carve out of the apparently indeterminable useful lives of the bows as a whole those particular lives that petitioners may (but did not) show to be limited, and get a depreciation deduction for the utility related to those lives. We do not, in general, allow the fee owner of land to fragment the varied utilities inherent in her ownership in order separately to depreciate those with a determinable useful life. I do not see why we should do so with respect to otherwise nondepreciable property, such as the bows.

HAMBLEN, JACOBS, and WHALEN, *JJ.,* agree with this dissent.