133 T.C. No. 13

UNITED STATES TAX COURT

TG MISSOURI CORPORATION f.k.a. TG (U.S.A.) CORPORATION, A
MISSOURI CORPORATION, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8333-06.                    Filed November 12, 2009.

P develops and uses production molds to
manufacture automotive parts for its customers.  P
contracts with third-party toolmakers to build the
production molds that P does not construct.  After a
third-party toolmaker finishes constructing a
production mold, P purchases the mold and incurs
additional design and engineering costs to modify the
mold so that it can be used to produce the desired
component part.  P then either sells the completed
production molds to its customers or retains ownership
of the molds, but in either case P keeps the molds for
production of automotive parts.  On its 1998 and 1999
tax returns, in calculating its research credit under
sec. 41, I.R.C., P included the amounts it paid the
third-party toolmakers for the production molds it
purchased and sold to P's customers, as the cost of
supplies.  R determined P improperly included the
amounts it paid for such molds as the cost of supplies
in computing its sec. 41, I.R.C., research credit

because the production molds sold to P's customers are assets of a character subject to depreciation.

   Held:  The production molds P sold to its customers are not assets of a character subject to the allowance for depreciation for purposes of secs. 41(b)(2)(C), I.R.C., and 174(c), I.R.C.  P properly included the costs of the production molds it purchased from third-party toolmakers and sold to its customers as the cost of supplies for calculating its sec. 41, I.R.C., research credit.

   William E. Elwood, Andrew W. MacLeod, and Peter J. Kulick, for petitioner.*

   Meso T. Hammoud, Elizabeth R. Proctor, and Eric R. Skinner, for respondent.

OPINION

   MARVEL, Judge:  Respondent determined deficiencies in petitioner's Federal income tax of $3,815,746 and $1,544,033 for 1998 and 1999,[1] respectively.  After concessions,[2] the sole issue for consideration is whether production molds petitioner sold to its customers are assets subject to depreciation for purposes of

_____

   *Brief amicus curiae was filed by Leslie J. Schneider and Patrick J. Smith as attorneys for Northrop Grumman Corp.

   [1]Petitioner's 1999 tax year began on Jan. 1, 1999, and ended on Mar. 31, 1999.

   [2]With the exception of the adjustments addressed in this Opinion, petitioner concedes all adjustments made by respondent with respect to 1998 and 1999.

sections 41 and 174.[3]  The resolution of that issue determines
whether the amounts petitioner paid to third-party toolmakers for
the molds[4] should have been included as "cost of supplies" in
petitioner's qualified research expenses for purposes of
computing its tentative research credits for 1997,[5] 1998, and
1999.

Background

The parties submitted this case fully stipulated under Rule
122.  We incorporate the stipulated facts into our findings by
this reference.  Petitioner's principal place of business was in
Missouri when its petition was filed.

Petitioner is in the trade or business of manufacturing
injection-molded products, such as steering wheels, air bags, and
body side molding, for customers in the automotive industry.
Petitioner's manufacturing process ordinarily begins when it
receives a request for quotation from a customer.  The request
for quotation includes general product specifications and
requirements and requires petitioner to develop a basic technical

---

[3]Unless otherwise indicated, all section references are to
the Internal Revenue Code (Code) in effect for the years in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

[4]The amounts for 1997, 1998, and 1999 were $25,909,801,
$12,363,599, and $4,602,854, respectively.

[5]Petitioner's 1997 tax year is only relevant as a
carry-forward year, as respondent did not determine a deficiency
for that year.

design for the injection-molded product. After receiving the request, petitioner contracts with the customer to develop a production mold that will enable petitioner to manufacture the desired product. Under the terms of the contract, petitioner is entitled to payment only if it successfully designs and builds a mold capable of producing a sample product and the customer accepts the products produced using the mold.

Depending on the particular injection-molded product, petitioner will either construct the production mold in-house or contract with a third-party toolmaker. When petitioner contracts with a third-party toolmaker, the toolmaker will construct the production mold according to petitioner's design specifications. The toolmaker does not guarantee that the mold will perform to petitioner's customer's specifications or produce the desired part in accordance with design specifications of petitioner's customers. Once petitioner and the third-party toolmaker develop a design, petitioner works with the toolmaker to build a prototype mold. The purpose of the prototype mold is to permit a limited number of test runs of the component part to isolate design flaws. Partly on the basis of input from testing the component parts of the prototype mold, petitioner then engages the third-party toolmaker to build the production mold. While the third-party toolmaker constructs the production mold,

petitioner accumulates all costs relating to the production mold's construction in a tooling inventory account.

After the third-party toolmaker finishes constructing the production mold, petitioner purchases the mold. However, the production mold petitioner purchases from the third-party toolmaker is not capable of producing sample products in accordance with the specifications of petitioner's customers. Consequently, petitioner incurs additional design and engineering costs to modify the production mold so that the mold produces the desired component part. These costs are primarily wages paid to petitioner's engineers.[6] The completed production mold is then used in the mass production of the single component part desired by the customer. From the request for quotation until the time the customer accepts the production mold, it generally takes 24 to 36 months to develop, design, construct, and test it.

Depending on the terms of the agreement between petitioner and the customer, the customer may either purchase the completed production mold from petitioner or, in certain cases, it may have petitioner retain ownership of the mold. The process for developing a production mold and the use of the mold in petitioner's business to produce the parts for the customer is the same regardless of whether petitioner retains ownership of

---

[6]Petitioner claimed the wages paid to its engineers as research expenditures under sec. 41. Respondent does not challenge these amounts.

the mold or the customer purchases the mold.  If petitioner retains ownership of the production mold, it depreciates the cost of the mold, and the customer effectively pays for the production mold by paying a higher per-unit price for the part produced using the mold.  Petitioner does not claim any research expenses or credit for the production molds it owns and depreciates.

If the customer purchases a completed production mold, title to the mold shifts to the customer once construction of the mold is completed and the customer pays for the mold.  However, petitioner retains possession of the mold for production of the component part, and the customer retains the risk of loss for the mold.[7]  Petitioner also reduces its tooling inventory account by the cost of the mold when it sells the mold to the customer.

Petitioner timely filed its 1997-99 Forms 1120, U.S. Corporation Income Tax Return.  On its 1998 and 1999 returns, petitioner capitalized and depreciated the costs paid to third-party toolmakers for the production molds for which it retained ownership.  However, with respect to the production molds sold to customers, petitioner included the costs paid to the third-party toolmakers as qualified research expenses for purposes of computing its section 41 research credit.  On its 1997, 1998, and 1999 returns, petitioner included in its qualified research

---

[7]Regardless of who retains ownership of the production mold, the customer may require petitioner to retain the mold for several years after production for the production of any spare parts.

expenses, for purposes of computing its research credit for each year, "cost of supplies" of $32,055,348, $15,192,035, and $5,347,217, respectively.[8]  Of those amounts, $25,909,801, $12,192,783, and $4,602,854 were attributable to the costs petitioner paid to third-party toolmakers for the production molds in 1997, 1998, and 1999, respectively.

On its 1997 tax return petitioner claimed a $2,316,601 research credit; petitioner used $48,675 of this amount in 1997 and carried forward $2,267,926 to 1998.  On its 1998 tax return, petitioner claimed a $1,225,235 research credit; petitioner used $306,636 of this amount in 1998 and carried forward $918,599 to 1999.  On its 1999 tax return, petitioner claimed a $399,472[9] research credit; petitioner used $231,558 of this amount in 1999 and carried forward $167,914.

On February 6, 2006, respondent mailed petitioner a notice of deficiency for 1998 and 1999.[10]  Respondent determined that the $25,909,801, $12,192,783, and $4,602,854 petitioner claimed in 1997, 1998, and 1999, respectively, for costs incurred in purchasing the production molds from third-party toolmakers did

---

[8]On its 1997, 1998, and 1999 returns, petitioner also included in its claimed qualified research expenses "wages" of $5,224,973, $5,151,557, and $1,230,404, respectively.

[9]The parties' stipulation 33 reflects an incorrect amount for petitioner's research credit.

[10]The notice of deficiency is dated Feb. 1, 2006, but the parties stipulated that respondent mailed it to petitioner on Feb. 6, 2006.

not qualify as research expenses for purposes of computing petitioner's tentative research credit for each year.  As a result of this and other adjustments,[11] respondent reduced petitioner's claimed research credit for 1997, 1998, and 1999 by $1,695,028, $876,992, and $301,610, respectively, and adjusted the amounts available for petitioner to carry over from these years.  Respondent's adjustments resulted in total allowable research credits to petitioner of $921,141 and $97,862 for 1998 and 1999, respectively, and total reductions to petitioner's allowable section 38 general business credit, as set forth in the notice of deficiency, of $216,357 and $623,684, respectively, for these years.

Petitioner timely filed a petition with this Court challenging respondent's adjustments.  Petitioner alleges in the petition that the costs it incurred in 1997, 1998, and 1999 in producing the production molds sold to its customers qualify as research expenditures for purposes of the section 41 research credit.  Petitioner asserts that it is entitled to the research and development tax credits it claimed for 1998 and 1999 and is entitled to carry over to those years all excess tax credits arising from 1997-99.

---

[11]Respondent also determined that $167,548, $170,816, and $37,290 of "wages" petitioner claimed as qualified research expenses for 1997, 1998, and 1999, respectively, did not qualify as research expenses for purposes of computing petitioner's sec. 41 research credit.  Petitioner concedes this adjustment.

When this case was called from the trial calendar of this Court, the parties moved pursuant to Rule 122 to submit this case fully stipulated. We granted the motion and set a briefing schedule. Both parties filed timely posttrial briefs in accordance with the briefing schedule.

Subsequently, Northrop Grumman Corp. filed a motion for leave to file a brief as amicus curiae. We granted Northrop Grumman Corporation's motion, and Northrop Grumman Corp.'s brief amicus curiae was filed. Respondent and petitioner each filed a response to Northrop Grumman Corp.'s brief amicus curiae.

## Discussion

I. Admissibility of Exhibits 8-P and 9-P

Respondent objects on relevancy grounds to the admissibility of Exhibit 8-P, Engineering and Valuation Report (engineering report), and Exhibit 9-P, Form 886-A, Explanations of Items, (revenue agent report). Although this case was submitted fully stipulated, respondent reserved an objection to the admissibility of these reports.

As a general rule, the Court will examine the positions of the parties de novo in a deficiency proceeding and will "not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations." Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). The

rationale for this rule "is the fact that a trial before the Tax Court is a proceeding de novo; * * * [the Court's] determination as to a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level." Id. at 328. On occasion, this Court has recognized an exception to this rule where there is substantial evidence of arbitrary or unconstitutional behavior by the Commissioner and the integrity of our judicial process would be compromised by permitting the Commissioner to benefit from such conduct. Jackson v. Commissioner, 73 T.C. 394, 401 (1979); Suarez v. Commissioner, 58 T.C. 792, 813-814 (1972).

Petitioner states that it offers the revenue agent report and the engineering report in an effort to fill the void created by respondent's failure to describe the basis for his determination in the notice of deficiency. Petitioner argues that the two reports will assist the Court in understanding respondent's basis for the proposed disallowance. In support of its argument petitioner cites Clark v. Commissioner, 266 F.2d 698, 707 (9th Cir. 1959), affg. in part, revg. in part and remanding T.C. Memo. 1957-129, for the proposition that a revenue agent's report is admissible when it is introduced only to show the basis used by the Commissioner in arriving at his determinations.

We are not persuaded by petitioner's argument.  Petitioner has not demonstrated that an exception applies to justify looking behind the notice of deficiency.  Although petitioner cites <u>Clark</u> in support of admitting the engineering report and the revenue agent report to explain respondent's determination, the Court of Appeals for the Ninth Circuit, which decided the appeal in <u>Clark</u>, never addressed the admissibility of the revenue agent's report.  The parties had stipulated that the report would be received in evidence for that purpose.  <u>Clark v. Commissioner</u>, T.C. Memo. 1957-129.  Therefore, we cannot and do not read <u>Clark</u> as requiring us to admit the engineering report and the revenue agent report to explain the basis of respondent's determination.

Moreover, the position of respondent's agent in his or her report is immaterial because the trial de novo examines only respondent's determination as set forth in the notice of deficiency.  Under these circumstances, we conclude there is no reason to consider the pre-deficiency-notice reports in reaching our decision.  We sustain respondent's objection with respect to Exhibits 8-P and 9-P.

## II.  <u>Burden of Proof</u>

Ordinarily, the Commissioner's determination in the notice of deficiency is presumed to be correct, and the taxpayer bears the burden of proving that the Commissioner's determination is erroneous.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115

(1933).  The fact that a case is fully stipulated does not change or lessen the taxpayer's burden.  Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).  However, the presumption of correctness does not apply and the burden of proof shifts to the Commissioner when he fails to make a determination and issues a "'naked' assessment without any foundation whatsoever".  United States v. Janis, 428 U.S. 433, 441 (1976).

Petitioner makes several arguments for shifting the burden of proof to respondent.  Petitioner argues that in the notice of deficiency respondent states only that petitioner's expenses do not qualify for the section 41 research credit and that the notice does not adequately explain respondent's disallowance of petitioner's general business tax credits.  Petitioner asserts that respondent unfairly forces petitioner to bear the burden of supporting essentially every dollar of the claimed research credits because it cannot identify which qualified research expenses respondent challenges, or the basis for those challenges.  Petitioner also contends that, because respondent has failed to make an evidentiary showing to support his deficiency determination, respondent's determination is not entitled to the presumption of correctness.

We do not address petitioner's arguments regarding the proper allocation of the burden of proof and the presumption of

correctness.  The assignment of the burden of proof does not affect the result, and our holding regarding petitioner's research credits eliminates the need to decide any issue raised by petitioner with respect to the burden of proof.

III. Research Credit Under Section 41

    A.    Sections 174(c) and 41(b)(2)(C)

The research credit was introduced with the enactment of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 221(a), 95 Stat. 241.[12]  Congress enacted the research credit to "encourage business firms to perform the research necessary to increase the innovative qualities and efficiency of the U.S. economy."  S. Rept. 99-313, at 694 (1986), 1986-3 C.B. (Vol. 3) 1, 694; H. Rept. 99-426, at 177 (1985), 1986-3 C.B. (Vol. 2) 1, 177.

Section 41(a)(1) allows a taxpayer to claim a credit, as part of the taxpayer's general business credit under section 38(b), against income taxes in an amount equal to 20 percent of the excess (if any) of the taxpayer's qualified research expenses for the year over the base amount.[13]  Section 41(b)(1) defines

----

[12]Originally, the research credit was included in sec. 44F. See Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 221(a), 95 Stat. 241.

[13]Sec. 41 provides, in pertinent part:

    SEC. 41(a).  General Rule.--For purposes of section 38, the research credit determined under this section for the taxable year shall be an amount equal to the sum of--

(continued...)

"qualified research expenses" as the sum of "in-house research expenses" and "contract research expenses" paid or incurred by the taxpayer during the taxable year in carrying on any of its trade or business.  Under section 41(b)(2)(A), "in-house research expenses" include any amount paid or incurred for "supplies" used in the conduct of "qualified research".  Section 41(b)(2)(C) defines "supplies" as any tangible property, but excludes from this definition (1) land or improvements to land and (2) "property of a character subject to the allowance for depreciation."

Section 41(d)(1) defines "qualified research" as research that meets the requirements of subparagraphs (A), (B), and (C). One of those requirements is that expenditures with respect to qualified research may be treated as expenses under section 174.[14]  Sec. 41(d)(1)(A).  Consequently, an expenditure must be a

_____

[13](...continued)

     (1) 20 percent of the excess (if any) of--

       (A) the qualified research expenses for the taxable year, over

       (B) the base amount * * *

    [14]Generally, sec. 174(a) allows a taxpayer to currently deduct research or experimental expenditures paid or incurred during the taxable year in connection with the taxpayer's trade or business.  Under sec. 174(a), the taxpayer may treat such research or experimental expenditures as expenses which are not chargeable to capital account.  Sec. 280C(c) provides that no deduction is allowed for the portion of the qualified research expenses otherwise allowable as a deduction which is equal to the

(continued...)

section 174 expense to constitute "qualified research" under section 41.  See <u>Norwest Corp. & Subs. v. Commissioner</u>, 110 T.C. 454, 489-490 (1998).  Section 174 does not define the phrase "research and experimental expenditures", but, similar to the definition of "supplies" in section 41(b)(2)(C), section 174(c) provides that section 174 does not apply to expenditures for "the acquisition or improvement of property to be used in connection with the research or experimentation and of a character which is subject to the allowance" for depreciation.[15]

Section 1.174-2(b)(2), Income Tax Regs., addresses a scenario in which research or experimentation expenditures result, as an end product of the research or experimentation, in depreciable property to be used in the taxpayer's trade or business.  Section 1.174-2(b)(2), Income Tax Regs., provides that subject to limitations of subparagraph (4), such expenditures may be allowable as a current expense deduction under section 174(a).  Section 1.174-2(b)(4), Income Tax Regs., in turn provides:

> The deductions referred to in [subparagraph] (2) * * * for expenditures in connection with the acquisition or production of depreciable property to be used in the taxpayer's trade or business are limited to amounts

---

[14](...continued)
amount of the credit claimed under sec. 41(a).

[15]Although sec. 174(c) excludes property of a depreciable character from being expensed under sec. 174, allowances for depreciation are considered research or experimental expenditures under sec. 174 to the extent that the property to which the allowances relate is used for research or experimentation.  Sec. 174(c); sec. 1.174-2(b)(1), Income Tax Regs.

expended for research or experimentation.  For the purpose of the preceding sentence, amounts expended for research or experimentation do not include the costs of the component materials of the depreciable property, the costs of labor or other elements involved in its construction and installation, or costs attributable to the acquisition or improvement of the property.[16]

B.    The Parties' Positions

Respondent argues that petitioner's costs in obtaining production molds from the third-party toolmakers are not eligible for expensing under section 174 and, consequently, the production molds do not qualify as "supplies" under section 41(b)(2)(C), because the costs at issue are for the acquisition and improvement of property of a character subject to the allowance for depreciation.  Respondent contends that the phrase "property of a character subject to the allowance for depreciation" in sections 41(b)(2)(C) and 174(c) refers to the character of the property itself and not to whether the property is depreciable in the hands of a particular taxpayer.  Respondent argues that an interpretation that focuses on the taxpayer's ability to depreciate the property renders the phrase "of a character" superfluous.  In respondent's view, property is of a depreciable

_____

[16]An example in sec. 1.174-2(b)(4), Income Tax Regs., is that of a taxpayer who undertakes to develop a new machine for use in his business.  The taxpayer expends a total of $30,000 on the project, of which $10,000 represents the actual costs of material, labor, etc., to construct the machine, and $20,000 represents research costs that are not attributable to the machine itself.  Id.  In this example, the $20,000 research costs are deductible under sec. 174(a), but the $10,000 is not deductible and must be charged to the asset account (the machine).  Id.

character if it is subject to wear and tear, exhaustion, or obsolescence, has a useful life exceeding 1 year, and is used in the taxpayer's trade or business.  In support of his argument, respondent cites section 167(a), which allows a depreciation deduction for the exhaustion, wear and tear, or obsolescence of property used in a taxpayer's trade or business.  Respondent also relies on Simon v. Commissioner, 103 T.C. 247, 260 (1994), affd. 68 F.3d 41 (2d Cir. 1995), suggesting that in Simon the Court interpreted the phrase property "of a character subject to the allowance for depreciation" (in the context of section 168) to mean property of a type which is subject to wear and tear, exhaustion, or obsolescence.  Because petitioner used the production molds it sold to its customers to manufacture the customers' desired automotive parts, respondent asserts that the molds were subject to wear and tear, exhaustion, or obsolescence, in petitioner's business.[17]  Respondent points out that petitioner depreciated the production molds in which it retained ownership and that petitioner used those molds in its business in the same manner as it used the production molds it sold to its customers.  Respondent concludes that petitioner's costs in acquiring the production molds from third-party toolmakers are not qualified research expenses under section 41.

_____

[17]The parties stipulated that the production molds had an expected useful life exceeding 1 year.

Petitioner and the amicus take a contrary view.  They argue that the reference to "property * * * of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.)" in section 174(c) and the reference to "property of a character subject to the allowance for depreciation" in section 41(b)(2)(C) mean property that is depreciable in the hands of the taxpayer.  Petitioner and the amicus draw support from statutes and regulations, the legislative history of section 174, and caselaw interpreting the depreciation provisions of section 167.

C.    Analysis of the Language of Sections 174(c) and 41(b)(2)(C)

We begin with the language of the relevant statutory provisions.  See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985).  If a statute is clear and unambiguous and the statutory scheme is coherent and consistent, the Court's function is to apply the statute as written and according to its terms. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Fernandez v. Commissioner, 114 T.C. 324, 329 (2000).  The statute must be read as a whole, and the meaning of a particular portion of a statutory provision must be determined with reference to its context.  See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000).  Ordinarily, we examine a statute's legislative history to ascertain congressional intent only if we determine

that the statute is ambiguous.  Fernandez v. Commissioner, supra

at 329-330.

Section 41(b)(2)(A)(ii) and (C)(ii) excludes from section 41

qualified research expenses any amount paid for "property of a

character subject to the allowance for depreciation" that is

"used in the conduct of qualified research".  Section 174(c)

similarly excludes from section 174 the costs of acquiring or

improving property "of a character which is subject to the

allowance * * * [for depreciation]" that is "to be used in

connection with the research or experimentation".  The Code

provides for the allowance for depreciation referred to in

sections 41(b)(2)(C) and 174(c) in section 167, which authorizes

a taxpayer who has a depreciable interest in property used in the

taxpayer's trade or business to deduct a reasonable allowance in

the form of depreciation for the wear and tear, exhaustion, and

obsolescence of property so used.[18]

We begin our analysis with an examination of the language in

sections 174 and 41 that Congress used to describe the property

costs that are excluded in calculating the section 174(a)

deduction and the section 41 research credit.  Section 174 sets

forth the rules governing the proper tax treatment of research

---

[18]Sec. 167(a) allows as a depreciation deduction a
reasonable allowance for the wear and tear, exhaustion, and
obsolescence of:  (1) Property used in the trade or business or
(2) property held for the production of income.

and experimental expenditures. Section 174(a)(1) provides that a taxpayer may treat research or experimental expenditures that he pays or incurs during the taxable year in connection with his trade or business "as expenses which are not chargeable to capital account." Section 174(a)(1) further provides that "The expenditures so treated shall be allowed as a deduction." Alternatively, section 174(b)(1) authorizes a taxpayer to elect to amortize research or experimental expenditures that are paid or incurred by the taxpayer in connection with his trade or business, are not treated as expenses under section 174(a), and are "<u>chargeable to capital account but not chargeable to property of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.) or section 611 (relating to allowance for depletion)</u>". Sec. 174(b)(1) (emphasis added). Specifically, section 174(b) allows a taxpayer to elect to treat research or experimental expenditures that are chargeable to a capital account but are not chargeable to property of a character subject to the depreciation allowance or the section 611 depletion allowance as amortizable deferred expenses that may be deducted ratably over a period of not less than 60 months. Research and experimental expenditures that are neither currently expensed nor amortized must be charged to capital account. Sec. 1.174-1, Income Tax Regs.

Section 174(c) describes expenditures that do not qualify for deduction under section 174(a) or for amortization under section 174(b). Section 174(c) provides as follows:

> SEC. 174(c). Land and Other Property.--This section shall not apply to any expenditure for the acquisition or improvement of land, or for the acquisition or improvement of property to be used in connection with the research or experimentation <u>and of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.) or section 611 (relating to allowance for depletion)</u>; but for purposes of this section allowances under section 167, and allowances under section 611, shall be considered as expenditures. [Emphasis added.]

Both section 174(b) and (c) use the same language to describe property "of a character which is subject to the allowance" under section 167. In the case of section 174(b), one of the express requirements that research or experimental expenditures must satisfy in order for the taxpayer <u>who paid or incurred those expenditures</u> to be able to elect to amortize them under section 174(b) is that the expenses must be chargeable to capital account but must not be chargeable to a depreciable asset account. In other words, section 174(b) examines the proper accounting treatment in the hands of the taxpayer of research or experimental expenditures made by the taxpayer. If the expenditures are capital but are not chargeable to a depreciable asset account, then the taxpayer may elect to amortize those expenses under section 174(b). If, however, the expenditures are chargeable to a depreciable asset account and therefore are

expenditures "of a character which is subject to the allowance under section 167", then section 174(c) ensures that the expenditures cannot qualify for expensing under section 174(a) or for amortization under section 174(b).

It is a well-established principle of statutory construction that a statute must be interpreted as a symmetrical and coherent regulatory scheme, Gustafson v. Alloyd Co., 513 U.S. 561 (1995); 2A Singer & Singer, Sutherland Statutory Construction, sec. 46:5, at 189-190 (7th ed. 2007), and courts consider the entire legislative scheme of which the particular provision is a part, 2A Singer & Singer, supra at 202-205. "'[T]he Code must be given "as great an internal symmetry and consistency as its words permit."'" Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993) (quoting Commissioner v. Lester, 366 U.S. 299, 304 (1961)). Both subsections (b) and (c) of section 174 use the same language to describe expenditures that will not qualify under section 174 for deduction or amortization. Section 174(b)(1)(C) makes clear that its reference to research or experimental expenditures that are chargeable to capital account but are not chargeable to property of a character subject to depreciation is a reference to the proper accounting treatment of the expenditures on the taxpayer's books and records and reflects Congress' intention that a taxpayer's expenditures that are properly charged to a depreciable asset account do not qualify

for section 174 expensing or amortization because they will be depreciated by the taxpayer under section 167.  Section 174(c), read in context, reinforces this conclusion because it clearly states that section 174 does not apply to such expenditures but that the depreciation allowance under section 167 with respect to those expenditures is itself a research or experimental expenditure for purposes of section 174.  In each case, section 174(c) clearly requires an examination of the proper tax treatment of the expenditure in the hands of the taxpayer.

An examination of the pertinent language of section 41 reveals a similar definitional approach in identifying those expenditures that constitute "qualified research expenses" under section 41(b).  Section 41(b)(1) defines the phrase "qualified research expenses" to include amounts paid or incurred by the taxpayer for in-house research expenses and contract research expenses.  Section 41(b)(2)(A)(ii) defines "in-house research expenses" to include amounts paid or incurred for supplies used in the conduct of qualified research.  Section 41(b)(2)(C) defines the term "supplies" to mean any tangible property other than land or improvements to land, sec. 41(b)(2)(C)(i), and "property of a character subject to the allowance for depreciation", sec. 41(b)(2)(C)(ii).  It is reasonable to interpret the language of section 41(b)(2)(C)(ii), like the comparable language in section 174(b) and (c), as a reference to

property that is not properly classified as depreciable property on the books and records of the taxpayer. Like section 174, section 41 reflects Congress' intent that a taxpayer not be allowed to expense the costs of purchasing or improving property that are properly chargeable to a depreciable asset account on the taxpayer's books and records and also include those costs in calculating the taxpayer's research credit under section 41.[19] Cf. S. Rept. 97-144, at 76 (1981), 1981-2 C.B. 412, 438; H. Rept. 97-201, at 110 (1981), 1981-2 C.B. 352, 357.

Our reading of sections 41(b)(2)(C) and 174(c) and our conclusion that the reference in both sections to property of a character subject to the depreciation allowance means property that is depreciable <u>in the hands of the taxpayer</u> are supported by the function of these provisions in the overall statutory scheme. By their terms, sections 41(b)(2)(C) and 174(c) prevent a taxpayer from receiving a credit for or expensing property used

---

[19]While the legislative history surrounding the enactment of sec. 174 offers little insight in interpreting sec. 174(c), the House and Senate committee reports accompanying the enactment of sec. 41 provide some guidance. After noting that sec. 174(c) expressly excluded the cost of depreciable property, both reports stated, as an example, that the "cost of a research building or of equipment used for research cannot be deducted in one year." S. Rept. 97-144, at 76 (1981), 1981-2 C.B. 412, 438; H. Rept. 97-201, at 110 (1981), 1981-2 C.B. 352, 357. Equipment used for research is excluded because it is of a character subject to the allowance for depreciation as used by the taxpayer in its research activities--i.e., the equipment is subject to wear and tear, exhaustion, and obsolescence in the taxpayer's research. See sec. 174(c); see also sec. 167(a).

in the taxpayer's research or experimentation activities where the cost is more appropriately recovered over time through depreciation deductions. Without these sections, a taxpayer could circumvent the gradual cost recovery mandated by the depreciation rules of sections 167 and 168 by recovering the full cost of such property in 1 year.

D. <u>The Phrase "of a Character Subject to the Allowance" for Depreciation in the Context of Other Code Provisions</u>

1. <u>Depreciation Provisions of the Code and Regulations and Relevant Caselaw</u>

Respondent states that under section 167(a) a depreciation deduction is allowed for tangible property which is subject to wear and tear and obsolescence, is used in a taxpayer's business, and has a useful life exceeding 1 year. Respondent correctly notes that in <u>Simon v. Commissioner</u>, 103 T.C. at 260, we interpreted the phrase "of a character subject to the allowance for depreciation" to mean that property must suffer exhaustion, wear and tear, or obsolescence to be depreciated.

However, respondent's analysis bypasses the inquiry as to whether a depreciation allowance under section 167 is appropriate with respect to particular tangible property in the first place. As discussed above, section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear (including a reasonable allowance for obsolescence) of property used in a trade or business or property held for the

production of income.  Section 1.167(a)-2, Income Tax Regs.,
recognizes that the depreciation allowance applies to tangible
property, but it specifically excludes inventories or stock in
trade as ineligible for depreciation allowances.  Accordingly, as
section 1.167(a)-2, Income Tax Regs., suggests, a taxpayer may
hold tangible property for use in a trade or business, for the
production of income, or as inventory or stock in trade.

With respect to inventories, for example, we have held that
whether property is used in a trade or business or is held
primarily for sale to customers in the ordinary course of the
taxpayer's trade or business, so as to preclude the depreciation
allowance, is a question of fact.  See Luhring Motor Co. v.
Commissioner, 42 T.C. 732, 751 (1964); see also Valmont Indus.,
Inc. v. Commissioner, 73 T.C. 1059, 1080-1081 (1980).  In Luhring
Motor Co. v. Commissioner, supra at 747-750, the taxpayer, an
automobile dealer, purchased from a manufacturer a supply of new
automobiles; most of the automobiles were held for immediate
sale, but the taxpayer assigned some of them to its employees and
claimed a depreciation deduction with respect to those
automobiles.  We recognized that the taxpayer could take some of
its new cars out of stock in trade and use them in its business
as depreciable assets, id. at 754, but found that the taxpayer
did so only temporarily without altering the essential purpose
for which the taxpayer acquired the vehicles, id. at 753.

Accordingly, we held that the taxpayer could not claim
depreciation deductions with respect to the automobiles.  Id. at
755.  Because the issue of whether a taxpayer may claim a
depreciation deduction with respect to an asset is a question of
fact, in the context of sections 174(c) and 41(b)(2)(C) the
phrase "of a character subject to the allowance for depreciation"
cannot mean there is a generic character of property that exists
without any reference to a particular taxpayer and such
taxpayer's use of the property.[20]

We also disagree with respondent's position that the
character of the production molds did not change as a result of a
sale to customers.  It is true that although petitioner
transferred title to the production molds to its customers,
petitioner retained possession of the molds and used them in its
business to produce component parts.  However, generally, only
taxpayers with an economic interest in an asset can deduct
depreciation with respect to that asset; "'The statutory
allowance [for depreciation] is available to him whose interest
in the wasting asset is such that he would suffer an economic
loss resulting from the deterioration and physical exhaustion as

---

[20]An approach incorporating sec. 1.167(a)-2, Income Tax
Regs., and caselaw interpreting depreciation provisions of the
Code is consistent with current sec. 1.168(a)-1, Income Tax
Regs., which provides that "The determination of whether tangible
property is property of a character subject to the allowance for
depreciation is made under section 167 and the regulations under
section 167."

it takes place.'" Hutchinson v. Commissioner, 116 T.C. 172, 185 (2001) (quoting Commissioner v. Moore, 207 F.2d 265, 268 (9th Cir. 1953), revg. and remanding 15 T.C. 906 (1950)); see also Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 254 (1939); Weiss v. Wiener, 279 U.S. 333, 335-336 (1929). Both the production molds that petitioner sold to customers and the ones it continued to own had useful lives over 1 year and were subject to wear and tear, and petitioner used them to make parts for the customers. However, the record does not allow us to conclude that with respect to the production molds sold to customers, it was petitioner who suffered an economic loss resulting from their deterioration and exhaustion. See Hutchinson v. Commissioner, supra at 185. Although petitioner retained physical possession of the molds after sale, its customers bore the risk of loss with respect to the production molds. The parties also stipulated that petitioner adjusted its pricing for the parts produced from the molds depending on whether it retained ownership of the production molds, and customers effectively paid a higher per-unit price for the parts produced using the molds if petitioner did not sell the molds. Accordingly, we disagree with respondent that the production molds that petitioner sold to its customers were no different from those petitioner continued to own. Because petitioner does not have an economic interest in production molds it has sold and cannot depreciate them for that

reason, the sold production molds are not property of a character subject to depreciation allowances under section 167.

### 2. Other Provisions of the Code

Besides sections 174(c) and 41(b)(2)(C), several other Code sections use the phrase "of a character subject to the allowance for depreciation" or its slight variation.[21]  Although none of these sections defines the phrase, we find the language of some other Code sections, in particular section 1239, instructive as to the meaning of the phrase in sections 174(c) and 41(b)(2)(C).

Section 1239 addresses gain from sale of depreciable property between certain related taxpayers and denies capital gain treatment on the sale of assets in certain circumstances. Section 1239(a) provides that the transferor's gain shall be treated as ordinary income "if such property is, <u>in the hands of the transferee</u>, of a character which is subject to the allowance for depreciation provided in section 167."  (Emphasis added.) Section 1239 was introduced in 1951, see Revenue Act of 1951, ch. 521, sec. 328(a), 65 Stat. 504, and by that time Congress had already used the term "of a character which is subject to the

---

[21]Such other sections in the current Code are secs. 30(c)(1), 30B(g)(1) and (h)(6), 30C(b)(1), (d)(1), and (e)(2), 42(d)(4)(B), (C)(i), and (e)(2)(A), 144(a)(1)(A) and (11)(B), 147(c)(2)(F)(i), 168(l)(2), 169(d)(4)(A), 172(d)(4)(A)(i), 175(c)(1)(A), 179A(d)(1) and (e)(6)(B), 179B(c)(2), 197(f)(7), 198(b)(2), 419(c)(3)(C)(ii)(I), 453(f)(7), 514(a)(3), 616(a), 617(a)(1), 818(b)(1)(A), 1017(b)(3)(B), 1221(a)(2), 1231(b)(1), 1239(a) and (e), 1245(a)(3), 1250(c), 7871(c)(3)(B)(i).

allowance" for depreciation in revenue legislation, see, e.g., Revenue Act of 1938, ch. 289, sec. 117(a), 52 Stat. 500 (enacting the predecessor of the current section 1221). When drafting section 1239, however, Congress did not merely reuse the already familiar phrase but clarified in the hands of <u>which</u> taxpayer the determination of the character of the property should be made. Because section 1239 discussed the transferor's gain but Congress deemed it necessary to determine the character of property by looking at the transferee, such clarification was necessary. If Congress believed that an asset were inherently depreciable as long as it were subject to wear and tear and obsolescence, clarifying in whose hands the property would be depreciable would be unnecessary, and the phrase "in the hands of the transferee" in section 1239(a) would be superfluous.

When section 1239 became part of the 1954 Code, Congress used the phrase "of a character which is subject to the allowance" for depreciation in the newly enacted section 174 as well as in nine other sections.[22] Generally, "'identical words used in different parts of the same act are intended to have the same meaning'". <u>Commissioner v. Keystone Consol. Indus., Inc.</u>,

---

[22]Such sections of the 1954 Code were sec. 169(d) (flush language) (repealed 1969), sec. 172(d)(4)(A)(i), sec. 174(b)(1)(C) and (c), sec. 175(c)(1)(A), sec. 615(a) (repealed 1976), sec. 616(a), sec. 1071(a) (repealed 1995), sec. 1082(a)(2)(A) (repealed 2005), sec. 1221(2), sec. 1231(b)(1), sec. 1239(b).

508 U.S. at 159 (quoting Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)).  We believe Congress could not have intended that property could be of a general character without reference to a specific taxpayer for purposes of section 174 and at the same time spell out in section 1239 in whose hands the relevant determination of the character should be made.

The current section 453 titled "Installment Method" takes an approach similar to that of section 1239.  Generally, section 453(a) provides that income from an installment sale shall be taken into account under the installment method.  Section 453(g) contains rules for an installment sale of depreciable property between related persons.  Section 453(f)(7) defines depreciable property as "property of a character which (in the hands of the transferee) is subject to the allowance for depreciation provided in section 167."  (Emphasis added.)  If we were to adopt respondent's reading of the phrase, the words "in the hands of the transferee" in section 453(f)(7) would also be superfluous.

E.    Section 1.174-2(b)(2) and (4), Income Tax Regs.

Respondent maintains that section 1.174-2(b)(4), Income Tax Regs., precludes application of section 174 to the costs of component materials for research and experimentation when research and experimentation result, as an end product, in depreciable property.  Because we hold that the production molds petitioner sold to customers are not of a character subject to an

allowance under section 167, the limitation applicable to costs of component materials found in section 1.174-2(b)(4), Income Tax Regs., does not apply.

IV. Conclusion

We hold that the production molds that petitioner sold to its customers are not assets of a character subject to the allowance for depreciation under sections 41(b)(2)(C) and 174(c) and that petitioner properly included the costs of the production molds it purchased from third-party toolmakers as the cost of supplies in calculating its section 41 research credit.  We conclude, therefore, that respondent's adjustments to petitioner's 1998 and 1999 returns are erroneous and are not sustained.

We have considered the remaining arguments made by the parties, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.